Jewel C. RICH et al.,
Plaintiffs-Appellants,

v.

MARTIN MARIETTA CORPORATION,
a Maryland Corporation,
Defendant-Appellee,

Equal Employment Opportunity
Commission, Amicus Curiae.

No. 74–1541.

United States Court of Appeals,
Tenth Circuit.

Argued April 30, 1975.

Decided Aug. 1, 1975.

Rehearing Denied Oct. 14, 1975.

As Amended Nov. 20, 1975.

George M. Allen, Sheldon, Bayer, McLean & Glasman, Denver, Colo. (Lawrence A. Wright, Jr., Snead, Wright & Babbs, Denver, Colo., on the brief), for plaintiffs-appellants.

Richard L. Schrepferman, Holme Roberts & Owen, Denver, Colo., for defendant-appellee.

Charles T. Reischel, Washington, D. C. (William A. Carey, Joseph T. Eddins, Jr., Beatrice Rosenberg, Margaret C. Poles, Washington, D. C., on the brief), for amicus curiae.

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The above named seven plaintiffs originally brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and pursuant also to 42 U.S.C. § 1981 on behalf of themselves and on behalf of the entire affected class. The trial court, after hearing all of the evidence, dismissed the cause for failure, as the court viewed it, of plaintiffs to prove a prima facie case.

Martin Marietta, the defendant-appellee, is a national corporation which operates primarily as a manufacturer on behalf of the United States Government in the aerospace industry. The plaintiffs were employed at defendant's Waterton, Colorado facility during the following periods:

Jewel Rich, from 1957 until she voluntarily terminated in March 1970. She was an engineer.

Thomas Franklin, from 1959 until the present, originally as an Accountant B on an hourly basis. At the time he filed the charges leading to this complaint he was an Associate Analyst, and subsequent to that he was promoted to a higher grade.

Lawrence Collier and John Craig, from 1961 until the present, first as janitors and later as Millwright B's, but just prior to trial they were promoted to Millwright A.

Jose Tafoya, hired in 1957 as an electrical mechanic. As of the time of the filing of charges he was a Developer, but prior to trial he was promoted to a salaried position, Associate Analyst. Later

he was demoted to Developer due to lay-offs.

John Langley, hired in 1958 as an E & E Fabricator; promoted to electrical mechanic and then to Developer. In 1972 he was promoted to a salaried position, Manufacturing Engineer. He was laid off, however, prior to trial.

Bobby Chappell was hired in 1957 as a janitor. From 1960 to 1971, except for a five-month period, he was an Electrician B. In 1971 he was promoted to Electrician A and continued in that position until the time of trial.

With the exception of Jose Tafoya, all of the plaintiffs are black. With the exception of Jewel Rich, all are male. All plaintiffs initially filed charges with the EEOC alleging discrimination in promotions. Additionally, Rich filed a charge of discriminatory firing; Tafoya also claimed harassment.

The plaintiffs, with the exception of Chappell, initially filed charges with the Colorado Civil Rights Commission. They thereafter filed their EEOC charges on the following dates: Rich—October 31, 1969; Franklin—August 27, 1969; Tafoya—December 3, 1969; Langley—October 27, 1969; Collier and Craig—August 23, 1969; Chappell—November 4, 1969.

The class in the original complaint included all females, Blacks and Hispano-Americans employed at the time or who might in the future be employed by Martin, but in the amended complaint the class was limited to all females, Blacks and Hispano-Americans who are presently employed by Martin. The district court (not the judge who tried the case) defined the classes within the narrowest possible limits. It carved out four sub-groups as follows: Female or Black engineers; Black Class B Millwrights; Black accountants; and Hispano electrical employees. As a result of this restricted approach, the class action went away. The *total* membership in the four sub-groups was limited to but 40. Notices were sent to these 40, nevertheless, allowing them to opt out. Twenty-two persons requested to be excluded. Plain-tiffs then conceded that the class as defined was not sufficient to satisfy the numerosity requirement and, therefore, the class action aspect was stricken or dismissed.

Plaintiffs had also originally sought to bring the action as a Rule 23(b)(2) class action, but the trial court held on November 9, 1972 that it could not be prosecuted as a (b)(2) class action since damages (back pay) were sought for the class. In the amended complaint filed November 20, 1972, plaintiffs sought to maintain the action as a Rule 23(b)(3) class action, but since the class was not sufficiently numerous the court, on December 7, 1972, declassified the action for failure to meet the requirements of Rule 23.

Plaintiffs had sought to obtain information applicable to the entire plant including the company's hiring practices throughout, the number of promotions in each department, broken down into categories by race and sex, together with detailed information about the departments in which the individual plaintiffs worked. Following the court's definition of the four sub-groups which have been mentioned, defendant-appellee objected to the scope of the interrogatories as no longer being relevant and also as being burdensome and expensive. This objection was sustained without stating a reason.

The cause proceeded to trial on December 10, 1973 on the individual claims of the plaintiffs. There was some evidence at the trial concerning the defendant's plant-wide activities, but this was largely offered by defendant. For the most part, the testimony at the trial pertained to the individual qualifications and work experience of the several plaintiffs.

The Martin plant was first opened in Denver in 1957. It does not appear nor is it contended that Martin had an express policy of segregation of its employees by either race or sex. The total employment during the years 1966 to 1972 ranged between 5,300 and 7,300 employ-

ees. About one-half of its employees are professionals; 10% are classified as officials and managers. These two categories are the salaried employees. The black, Spanish-American and female employees are for the most part concentrated in the lower categories.

Martin is divided into functional departments such as administration, engineering, manufacturing and finance. There are three main groups, the salaried employees, the hourly in-unit employees who are subject to a collective bargaining agreement, and hourly out-of-unit employees. Salaried employees are promoted strictly on the basis of merit, as are hourly employees promoted to a salary level. The system of promotion applicable to the hourly in-unit employees calls for the promotion being offered first to the most senior qualified employee within the job family group and the other most senior qualified employee within the seniority unit. Finally, the job is offered to an outsider.

For out-of-unit employees, excluding key punch, the company policy was to promote qualified employees, taking into account seniority. In the key punch area the most senior employee in the next lower classification was promoted.

There is a system of periodic evaluation by supervisors. These evaluations are discussed with the employees. In some of the departments, including engineering, there is a device called a "totem pole" for determining promotions, demotions and layoffs. Each employee who is salaried is ranked in order of merit in his particular unit or section. In the engineering department the unit head meets with the group engineers to discuss and rate the engineers within the salary unit.

The defendant offered evidence (Exhibit K) that from 1966 to 1972, a greater percentage of minority employees received merit salary increases and promotions than did non-minority employees. It is noteworthy, however, that minorities also experienced more demotions and layoffs proportionally than did non-minorities. See Chart I–A (Appendix B). The statistics on behalf of the defend-

ant-appellee are not entirely responsive to plaintiffs' evidence in that the categories of minorities are different. The company was allowed to include Orientals and American Indians as minorities and to exclude white women. Charts I–A and B (Appendix B) show that the exclusion of non-black and non-Spanish-American employees from the category may produce a substantial change in the statistics.

Martin's statistics sought to show with respect to promotions from hourly rating to salary that black and Spanish-American employees received more such promotions in relation to their population in the plant than did non-minorities. This may, however, be incomplete. As shown by Chart II, the blacks and Chicanos received substantially less promotions in relation to their population within the hourly work force.

Generally, the statistics presented in this record show blacks and Spanish-Americans to be concentrated in the lower categories, where they tend not to be promoted from the hourly ranks to the salary ranks; that the total percentage of blacks and Spanish-Americans employed by defendant remains pretty much the same between 1966 and 1972.

## THE INDIVIDUAL PLAINTIFFS' CASES

It is unnecessary to burden the body of this opinion with details of the testimony of the several plaintiffs since the support for allegations that they were the victims of discrimination is largely circumstantial evidence, and the somewhat lengthy facts can be better presented in an appendix to this opinion. See Appendix A.

These people had some things in common, that is, they were old employees, all having been hired in the late 1950's. Secondly, none of them was given either recognition or promotions.

Mrs. Rich was a professional salaried employee and was thus subject to the vagaries of the so-called totem pole. Involved in this were various staff meet-

ings between the unit chief and the group engineers who rated the subordinates. Criteria were broad, general and subjective; such things as output, dependability and reliability. The ratings given were reviewed by the section chief who ordinarily ratified them.

As to employees Franklin, Tafoya, Langley, Collier, Craig and Chappell, the ratings were given by superiors after consultations. None of the persons in supervisory positions over the plaintiffs were minority members.

Supposedly there were inservice training programs which were designed to foster and encourage promotions, but as to the positions in which the plaintiffs were involved, there was little showing of availability of training which would lead to recognition and promotion. There was an organized inservice program for millwrights, but this did not commence until 1969 (which was when the complaints were filed).

The somewhat detailed evidence in the appendix shows that for these minorities at least the promotion effort was a lengthy and laborious one which ordinarily ended in only temporary promotion followed by cutbacks, reductions in grade and layoffs. Seemingly little credit was given for experience and lengthy service. The evidence was not so devoid of merit as the trial court found. Had the court approached the problems on the basis that availability of positions for promotion was not limited to a specific date and a specific position, and if it had questioned the legality of the promotion procedures, the result could have been different.

## THE FINDINGS

The trial court made findings which evaluated the plight of each plaintiff individually:

As to plaintiff Rich, the court found that her promotions were in accordance with her qualifications and abilities, and that she was not discriminated against either in the failure to promote her or in laying her off.

As to Franklin, the court found that he also was promoted according to his ability, job knowledge, experience and future advancement potential; that he was not discriminated against.

As to Tafoya, the court said that he failed to meet the Supreme Court's criteria in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and that the company had based promotions on the bona fide system unrelated to national origin.

As to Langley, the court found that it was not until 1972 that he had the requisite qualifications, and at that time he was promoted. The court said that the company's policies for promotions to salaried positions were non-discriminatory and based on ability.

As to Collier and Craig, the court found that they failed to prove that they were qualified for the Millwright A position. The court further said that it was not significant that there were no Millwright A's before 1971 who were also black, and this was not discriminatory.[1]

As to Chappell, the court said that he failed to prove that he was qualified for promotion to Electrician A from Electrician B; that there was no discrimination in this decision.

The court made general findings as well that:

The totem pole system was not discriminatory in practice. Although the court noted that it had aspects of subjectivity, it ruled that it furnished a reasonable measure of successful job performance.

■ The fact that all white male supervisors make the evaluations and establish the ratings does not constitute discrimination; that subjective evalua-

---

1. The term millwright as used at the Martin plant is misleading. This is just a title for a very menial position whether it be A or B. It involves applying a screwdriver to screws or a monkey wrench to bolts. There was little difference shown between Millwright A and Millwright B.

tion of black employees by white supervisors is not per se discriminatory.

■ The failure to use a post and bid system of promotion does not establish discrimination; that such a system could be disadvantageous to minority employees. The aerospace industry does not use this system.

■ The system used for determining promotions for plaintiffs and all other employees is based on a valid and reasonable measure of job performance. It does not have an exclusionary effect on blacks, Spanish-Americans or women.

The Martin Company actively assists minorities, has an affirmative action program for them and is actively involved in community educational programs for minorities.

That substantial overall increases in minority employment occurred between 1966 and 1973.[2]

The court further found that the company hired minorities at a rate in excess of the minority population.[3]

The contentions:

Plaintiffs, with the support of the EEOC, seek reversal alleging the following errors:

First, the pretrial court's action limiting the class to those persons in the same ethnic group and job classification as the named plaintiffs. A subsidiary question is whether class-wide back pay relief is recoverable in addition to injunctive and declaratory relief. The court denied that it would be (under Rule 23(b)(2)).

Second, the pretrial court's denial of plant-wide discovery, a ruling which followed from the narrow limits of the subclasses. Even with these narrow classes

and individual claims, proof of pervasive discrimination would have been relevant in proof of the individual claims.

Third, defendant's promotion policies were discriminatory contrary to the trial court's finding. The trial court erroneously ruled that plaintiffs failed to establish a prima facie case of discrimination in promotions.

Fourth, That it was error for the trial court to find that each plaintiff failed to satisfy the criteria announced in *McDonnell-Douglas v. Green, supra,* with respect to the elements of a prima facie case; appellants contend that the standards of this decision, insofar as applicable, were satisfied.

Fifth, that the trial court erred in striking Mrs. Rich's claim for damages for psychological harm pursuant to 42 U.S.C. § 1981.

Sixth, that the court erred in ruling that Rich and Tafoya did not file timely charges under 42 U.S.C. § 2000e et seq. and in failing to consider the applicability of 42 U.S.C. § 1981, which does not have the strict time requirements which Title VII has.

I.

THE CLASS ACTION QUESTION

First and most important is whether the court erred in limiting and restricting the classes by rejecting plaintiffs' attempt to represent all females, blacks and Spanish-Americans and in limiting the plaintiffs to representation of four subclasses which reflected the occupations of the named plaintiffs, namely: black or female engineers; black Class B Millwrights; black accountants; and black or Spanish-American electronic developers.[4] Notice was sent to the mem-

---

**2.** This period goes far beyond the year 1969 when the actions before us accrued. Also, the court was using not only the minority groups alleged in the complaint, but using the company's classification of minorities which included Orientals and Native Americans. This is not responsive to the plaintiffs' charges and it undermines the findings.

**3.** Here again the minority population in the five-county Denver area was not germane and

was not entitled to be featured in the court's findings in view of the narrow scope that the trial court had given to the plaintiffs' case. We do not say that it was error to receive the evidence, but it could not have been meaningful in relation to the plaintiffs' evidence.

**4.** As of the time of the court's ruling the plaintiff, Bobby Chappell, had not yet intervened as a plaintiff.

bers of these classes as limited. The notice informed them that they could opt out. About half of the members chose to do so. The court then declassified the action giving as a reason failure to meet the numerosity requirement. As it developed the notices could have been dispensed with because at that point it was clear that the numerosity requirement could not be satisfied.

The court restricted plaintiffs in another way: Plaintiffs in their original complaint alleged a Rule 23(b)(2) class action, but at the November 9, 1972 hearing the trial court ruled that the action could not be brought as a (b)(2) action because plaintiffs sought money damages on behalf of the class, so plaintiffs amended their complaint to allege a Rule 23(b)(3) class action. The court allowed the amendment, but held this did not alter the proposed classes theretofore established and did not result in making the action a class action.

The Rule 23(b)(2) or (b)(3) issue is not primary. Our main concern is with the action limiting the class to those employees who were directly competing with the plaintiffs within their departments. In effect, the class was reduced to those individuals only who were of the same race or ethnic origin and who performed the same job.

■ We must disagree with the action taken as being contrary to the decisions of the Supreme Court and the other federal courts in this type of case.

■ Class actions are generally appropriate in Title VII employment discrimination cases. The reason for this is that although these suits are self-help, so to speak, actions, they also have a broad public interest in that they seek to enforce fundamental constitutional principles as well as to advance the rights of the individual plaintiffs who bring the action. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); *Jenkins v. United Gas Corp.,* 400 F.2d 28 (5th Cir. 1968). *See also, Barela v. United Nuclear Corp.,* 462 F.2d 149 (10th Cir. 1972). Also, the class action avoids a multiplicity of suits.

■ The courts have made clear that in the design of these classes not every member of the class need be in an identical situation as the named plaintiffs. Indeed, the courts have consistently ruled that even though it appears that the named plaintiffs have not suffered discrimination, this fact does not prevent them from representing the class. *Roberts v. Union Co.,* 487 F.2d 387 (6th Cir. 1973); *Smith v. Delta Air Lines, Inc.,* 486 F.2d 512 (5th Cir. 1973); *Huff v. N.D. Cass Co.,* 485 F.2d 710 (5th Cir. 1973); *Moss v. Lane Co.,* 471 F.2d 853 (4th Cir. 1973); *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970). *See also, Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239 (3d Cir. 1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), which recognizes that plaintiffs' voluntary departure from defendant's employ did not operate to prevent them from representing a class of past and present employees.

In *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969), the plaintiff had alleged discharge because of race. He sought to represent all black employees of defendant. However, the trial court restricted the class to persons who had been discharged because of race. The court of appeals reversed saying that plaintiff had made an across-the-board attack on defendant's hiring, firing and promotion policies as they applied to black employees and, therefore, plaintiff was entitled to represent all of them. *See, also, Evans v. Local 2127, Internat'l Bd. of Electrical Wkrs.,* 313 F.Supp. 1354 (N.D.Ga.1969).

In *Smith v. Delta Air Lines, Inc.,* 486 F.2d 512 (5th Cir. 1973), the plaintiff's claim was somewhat narrow in that it

alleged that the company's personal grooming regulations were discriminatory in effect. The trial court denied recovery on this ground, holding that these regulations were not discriminatory. It dismissed the class action. However, on appeal the Fifth Circuit remanded for determination of whether other discriminatory practices could be shown and whether a class action might still be appropriate.

In the case at bar as in some of the other cases cited, the plaintiffs made a broad scale attack on the defendant's employment and promotion policies. Their complaint extended beyond challenging the promotional practices in their own departments and alleged that the promotional policies throughout the plant had a discriminatory effect. To the extent, therefore, that employees throughout the plant of the Martin Company were discriminated against as a result of the company's policies, the plaintiffs made claims which embraced these other people regardless of whether they were engaged in work identical to that of the plaintiffs.

If the classes were always limited as they were in this case, it would effectively make Rule 23 a nullity. It is understandable that hard pressed trial courts would not consider this too unfavorable a result. But the test of validity or continued existence of the rule is not the difficulty or complexity of administration. So long as it is on the books it is to be given effect.

It is also important to stress that in the case at bar the only ground assigned by the court for its action was the failure of the class to satisfy the numerosity element. Since the view which we take is that the plaintiffs' proposed classification was perfectly valid, it follows that it was error for the court to reject it. On remand there should be no problem in satisfying the numerosity requirement of Rule 23(a).

■ The trial court also ruled that there could not be a class action under Rule 23(b)(2) because damages were sought for the class. It is true that Rule 23(b)(2) provides that a class action is appropriate when:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.Rules Civ.Proc., Rule 23(b)(2).

The Advisory Committee has noted that "the subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *See also, Barela v. United Nuclear Corp.*, 462 F.2d 149 (10th Cir. 1972). It is to be emphasized, however, that neither the rule nor any cases construing it hold that a request for class action relief in the form of back pay renders Rule 23(b)(2) inapplicable. True, the primary relief sought must be injunctive or declaratory, but it does not require that this be the *only* relief sought.

■ The several courts of appeals have uniformly held that relief in the form of back pay may and should be granted in a Rule 23(b)(2) class action case. *See, e. g., Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870 (6th Cir. 1973); *Moody v. Albermarle Paper Co.*, 474 F.2d 134 (4th Cir. 1973), *cert. granted*, 419 U.S. 1068, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969). In *Robinson v. Lorillard, supra*, the court said:

> This is a case in which final injunctive relief is appropriate and the defendants' liability for back pay is rooted in grounds applicable to all members of the defined class. Under these

circumstances the award of back pay, as one element of the equitable remedy, conflicts in no way with the limitations of Rule 23(b)(2).

444 F.2d at 802.

On June 25, 1975, the Supreme Court recognized that in a Rule 23(b)(2) action, while injunction is an appropriate remedy under the express terms of the Rule, also back pay to the class is appropriate under Rule 23(b)(2). The Court's decision was in *Moody v. Albermarle Paper Co.*, which is cited above. The judgment of the Fourth Circuit reported at 474 F.2d at 134 was vacated and remanded. The Supreme Court said:

> It is true that backpay is not an automatic or mandatory remedy: like all other remedies under the Act, it is one which the courts "may" invoke. The scheme implicitly recognizes that there may be cases calling for one remedy but not another, and—owing to the structure of the federal judiciary— these choices are of course left in the first instance to the district courts.

The Supreme Court emphasized that the discretion to award back pay was not unlimited and that it must be exercised to accomplish the objects and purposes of Title VII, which objects are to achieve equality of employment opportunity and to deter discriminatory practices. The award of back pay in proper cases serves these objectives. Another Title VII purpose is to make persons whole for injuries suffered on account of unlawful employment discrimination. It was mentioned that the back pay provision of Title VII was modeled after that of the National Labor Relations Act which awards it as a matter of course. The Court then went on to say that lack of bad faith was not a reason for denying back pay since the economic harm was suffered whether or not the employer acted in bad faith.

If nothing else, this decision displays a judicial attitude which is vastly different from that adopted by the pretrial as well as the trial court in the instant case. Also, it removes all doubts as to whether back pay can be awarded under Rule 23(b)(2) as well as Rule 23(b)(3).

On remand, then, the class action aspect of the case should proceed under Rule 23(b)(2) for purposes of possible injunctive and declaratory relief, and in the event that a case is successfully established for back pay to the affected class, this aspect of the case should, for purposes of injunctive and declaratory relief, proceed under Rule 23(b)(2) and for purposes of back pay under either Rule 23(b)(2) or Rule 23(b)(3). The potential numbers in the class are not so large as to cause insurmountable management problems. There would be not to exceed 500 minority members and 1,000 female members of the class. These numbers are reasonably manageable so that appropriate relief can be awarded.

## II.

## DISCOVERY PROBLEMS

Following the trial court's order that the action be declassified, plaintiffs submitted their initial interrogatories which had sought information dealing with plant-wide job and promotional policies. Defendant (quite naturally) objected, the ground being that the proposed interrogatories were irrelevant to the action as redesigned, whereby undue burden would result from compelling answers. There were 69 of these, and they sought extensive information as to basic conditions and trends. A request was made to Martin for names of each of its departments and for the numbers of blacks, Hispanos and women in each. A request was also made for a breakdown of the promotions and layoffs in each of the departments separated into categories of blacks, Hispanos and women. The work records of all employees in these departments were also requested, and still other inquiries pertained to the numbers of blacks, Hispanos and women hired and rejected by the Martin Company.

After a hearing, which was not transcribed, the court entered an order sus-

taining all of the defendant's objections. Plaintiffs then proceeded to frame a second set of interrogatories. This set was limited to information about employees who worked in the immediate vicinity of the plaintiffs and whose names the plaintiffs could recall. Thus, access was denied to information which would have allowed plaintiffs to establish general overall trends and policies in the defendant's hiring, promotion, demotion and layoff practices within individual departments on a plant-wide level.[5]

The defendant, on the other hand, had plant-wide information and was allowed to present statistics at trial to show that a higher percentage of minorities received promotions in the plant as a whole during the years 1966–72 than non-minorities. Due to the limitations on discovery, plaintiffs were also deprived of information to rebut these general statistics of defendant. For example, it was impossible to show that the large percentage of the minority promotions were at lower employment levels with high turnovers or that substantial numbers of these promotions involved Orientals.

Plaintiffs maintain that the limitations which were imposed on them in conducting their discovery constituted prejudicial error. In our opinion the court should have allowed the facts to be explored, for there were no other means of ascertaining whether there was merit in the allegations of the plaintiffs. If the answers to interrogatories failed to establish discrimination, the doubts would be dispelled and the matter would be ended. To frustrate the search is a most unsatisfactory result in that it fosters suspicion. Also, it was grossly unjust to

allow the defendant company to utilize plant-wide statistics involving large classes of people plus statistics of other employers in this five-county area, while at the same time restricting the plaintiffs to the narrowest possible scope. It was also inequitable to allow the company to show statistics for a period far beyond the alleged violations while the plaintiffs, because of inability to discover, could not gain information or statistics to show that Martin changed its promotion policies immediately following the EEOC complaint being filed.

▪▪▪ It is plain that the scope of discovery through interrogatories and requests for production of documents is limited only by relevance and burdensomeness, and in an EEOC case the discovery scope is extensive. This is a factor which the court should balance on the benefit side as against the burden to the defendant in answering the interrogatories. *See* 8 C. Wright & A. Miller, Federal Practice and Procedure § 2174, at 548 (1970). If the information sought promises to be particularly cogent to the case, the defendant must be required to shoulder the burden. There is a remedy, of course, if the effort fizzles. The costs can finally be assessed to the interrogating parties.

Our court has in prior cases dealt with the issue of relevancy of plant-wide employment practices and employment practices within individual departments. Thus, in *Joslin Dry Goods Co. v. EEOC*, 483 F.2d 178 (10th Cir. 1973), the complaint was unlawful discharge. EEOC issued a subpoena requesting hiring and firing practices of all of defendant's stores in the area. The district court

---

**5.** It should be noted that the defendant maintains that by agreement between defendant's counsel and plaintiffs' counsel, plaintiffs' counsel had access to all of defendant's documents, but failed to go to the expense of compiling statistics. There is no evidence of such an agreement in the record. In any event, it is not at all clear that a general invitation to inspect records satisfies the defendant's obligations under the discovery rules. *See* discussion *infra*.

It should also be noted that the plaintiffs did have access to the defendant's EEO–1 Reports, which the defendant is required to file with the EEOC under 29 C.F.R. § 1602.7. From these reports the plaintiffs were able to compile statistics on the number of blacks, Hispanos and women in each of the defendant's departments as of particular dates. The information, however, was not at all probative of defendant's promotion policies, the major issue in the plaintiffs' case.

refused to enforce the subpoena. Our court agreed that the request should have been limited to the store in which the plaintiff was employed; it also recognized the relevancy of store-wide inquiry, and in doing so reversed the district court's ruling that the EEOC was barred from investigating hiring as well as firing practices.

In a more recent case, *EEOC v. University of New Mexico*, 504 F.2d 1296 (10th Cir. 1974), the complainant alleged discriminatory failure to promote and retaliatory discharge. Again an EEOC subpoena issued demanding copies of personnel files of all persons terminated between 1970 and 1973, and personnel files for all faculty members employed by the defendant as of the date of complainant's termination. The district court enforced the subpoena and the Tenth Circuit affirmed.

In *Circle K Corporation, Inc. v. EEOC*, 501 F.2d 1052 (10th Cir. 1974), an applicant was told to return when she finished a cashier training program. She did so and was then told that she would be contacted. However, she never was contacted, and when she reapplied she was told that she did not qualify. The EEOC pursued a broad scope of discovery. It consisted of:

> . . . a list of all applicants and present employees subjected to the polygraph examination, their racial-ethnic identity and whether they were accepted or rejected; documentation of the nature, standardization and validity of the polygraph test and a list of questions asked of each applicant; qualifications of the examiners who administered the tests; testimony under oath of all knowledgeable employees and officers; and all related matters.

Id. at 1054.

The district court turned away the demand for access to this information. Our court reversed, refusing to recognize the objections that the information lacked relevancy and was too burdensome.

It cannot be said, therefore, that the policy of this court has been to narrowly circumscribe discovery in EEOC cases.[6] The fact that these cases had to do with discovery efforts by the EEOC itself rather than by individuals cannot serve as a point of departure. *See Burns v. Thiokol Chemical Corp.*, 483 F.2d 300 (5th Cir. 1973). The Act's purposes in each instance are the same. Whether, then, the action is by a plaintiff or by the government, the object is "the elimination of employment discrimination, whether practiced knowingly or unconsciously and in relation to employment or advancement criteria which, although neutral on its face, is in fact discriminatory in its application." *EEOC v. University of New Mexico*, 504 F.2d at 1302. Information relevant in an EEOC inquiry is equally relevant in a private action.

The plaintiffs' requested information as to hiring, firing, promotion and demotion of blacks, Hispanos and women on a plant-wide basis and within individual departments was relevant in either an individual or class action. Particularly in light of the contention of the defendant and the findings of the court that the circumstantial evidence was ambiguous, it became the more necessary for the plant-wide statistics and facts to be obtained and presented, for they very likely would prove crucial to the establishing or failure to establish a prima facie case.[7]

---

6. Many cases in other circuits have reached the same conclusion. *See Motorola, Inc. v. McClain*, 484 F.2d 1339 (7th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 287 (1974); *Local No. 104, Sheet Metal Workers Int'l Assoc. v. EEOC*, 439 F.2d 237 (9th Cir. 1971); *Graniteville Co. v. EEOC*, 438 F.2d 32 (4th Cir. 1971); *Blue Bell Boots, Inc. v. EEOC*, 418 F.2d 355 (6th Cir. 1969); *Georgia Power Co. v. EEOC*, 412 F.2d 462 (5th Cir. 1969).

7. *See Brito v. Zia Co.*, 478 F.2d 1200 (10th Cir. 1973); *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245 (10th Cir.), *cert. denied*, 401 U.S. 954, 91 S.Ct. 972, 28

In *Woods v. North American Rockwell Corp.*, 480 F.2d 644 (10th Cir. 1973), the plaintiff contended that he was given an examination which was irrelevant in relationship to the job he was seeking. The court held that since the plaintiff made no showing that the test itself produced a discriminatory result, plaintiff had failed to establish a prima facie case. The court went on to hold that the plaintiff was required to demonstrate with statistics or otherwise the discriminatory effect of the promotion test. We think it is plain, therefore, that the plaintiffs had a right to the information and statistics from which they could have compiled trends and policies on the numbers of white persons receiving promotions during the relevant time periods in the departments and throughout the plant opposed to the number of blacks, Hispanos and women who received promotions. If it is true that the immediate evidence and circumstances pertaining to the plaintiffs are not sufficient to constitute a prima facie case, plant-wide statistics and department statistics are of the highest relevance.[8]

If the plaintiffs do establish a prima facie case and if the defendant is able to rebut it by showing a business necessity, such information or statistics would also be relevant to an attempt by the plaintiffs to show that the business necessity was pretextual. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 805 n.19, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Motorola, Inc. v. McClain*, 484 F.2d 1339 (7th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 287 (1974).

Under the facts and circumstances of this case, taking into account that defendant was allowed to defend with plant-wide statistics, the relevance of the information sought by the plaintiffs both in support of their initial case and for the purpose of rebuttal has a high degree of relevance and cannot be ruled out as burdensome. In all likelihood the defendant already has the figures isolated and computed. If not, it ought to proceed forthwith compiling them or at least compiling information from which the plaintiffs can prepare their evidentiary tables or statistics. The fact that they might have been generally invited to peruse the defendant's documents does not fill the bill. Such an approach does not compel the defendant to come forward with everything demanded as does an interrogatory.[9]

### III.

### THE PRIMA FACIE CASE

The district court's ruling after voluminous findings was that plaintiffs had failed to establish a prima facie case. It cited two grounds: First, that the plaintiffs' statistical evidence failed to show existence of discrimination in the employment practices of the company and, second, that plaintiffs had failed to show generally that they were qualified for promotion to available positions. From a reading of the court's findings, it is apparent that it was defendant's statistics and other evidence that impressed

---

L.Ed.2d 237 (1970); *see also United States v. N.L. Industries, Inc.*, 479 F.2d 354 (8th Cir. 1973); *Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421 (8th Cir. 1970). *See generally* the discussion *infra* on the requisites of a prima facie case.

**8.** The Sixth Circuit has stated this principle as follows:

Discrimination on the basis of race is by definition class discrimination . . . and the existence of patterns of racial discrimination in job classifications or hiring situations other than those of the complainants may well justify an inference that the prac-

tices complained of here were motivated by racial factors.

*Blue Bell Boots, Inc. v. EEOC*, 418 F.2d 355 (6th Cir. 1969). *See also Kohn v. Royall, Koegal & Wells*, 496 F.2d 1094 (2d Cir. 1974); *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300 (5th Cir. 1973); *Graniteville Co. v. EEOC*, 438 F.2d 32 (4th Cir. 1971); *Georgia Power Co. v. EEOC*, 412 F.2d 462 (5th Cir. 1969).

**9.** *See New Orleans Public Service, Inc. v. Brown*, 507 F.2d 160 (5th Cir. 1975); *Circle K Corp., Inc. v. EEOC*, 501 F.2d 1052 (10th Cir. 1974); *Sheet Metal Workers Int'l Assoc. v. EEOC*, 439 F.2d 237 (9th Cir. 1971).

the court that there had not been discrimination, but it also noted the lack of a sufficient prima facie case at the outset. The case is being remanded and so we need not dwell on these findings.

In support of its ruling that there was a failure to show a discriminatory impact, the trial court relied on statistics presented by defendant covering the years from 1966 to 1973, an excessive period, the rights having accrued with the filing of charges with the EEOC in the latter part of 1969. True, the statistics showed slight improvement between 1966 and 1973, but most of the improved employment practices occurred between 1969 and 1973. See Chart III appended hereto. It is, of course, desirable for the company to improve even after the filing of charges. Our point is that it does not constitute cogent evidence of lack of pre-filing discrimination.[10] If post filing conduct is to be taken into account at all, it might tend to show the existence of prior discrimination and an effort to repair the harm after discovery.[11] It is to be pointed out as well that the extended defendant's statistics did not distinguish between blacks, women and Chicanos and Orientals and American In-

dians. Inclusion of these latter categories was not relevant and rendered the statistics useless, particularly in view of the fact that the Orientals especially were heavily represented in the upper echelon of the labor force[12] On remand statistics should comport to the specific issues presented. If, for example, the plaintiffs' evidence is confined to the Martin plant, the court should require Martin's evidence either to be responsive or not be considered, and the statistics of the plaintiffs should be considered in the light of the fact that the defendant's promotion criteria were often quite subjective. See the cases cited in *Muller v. United States Steel Corp.,* 509 F.2d 923, 928 (10th Cir. 1975).

■ In ruling that the plaintiff's statistics did not serve to establish a prima facie case of discrimination, the court held that the plaintiffs had failed to meet the standards of *McDonnell-Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The trial court seemed particularly fascinated by the criteria set forth in the *McDonnell-Douglas* decision.[13] Thus, the court gave a

10. *See Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 257 (3d Cir. 1975) *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Franks v. Bowman Transportation Co.,* 495 F.2d 398 (5th Cir. 1974), *cert. denied,* 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975); *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421, 426 (8th Cir. 1970); *Jenkins v. United Gas Corp.,* 400 F.2d 28 (5th Cir. 1968).

11. We are not saying, however, that these latter day statistics would be irrelevant in connection with whether injunctive relief would be necessary or appropriate.

12. The upper echelons of the defendant's labor force were occupied by the salaried employees. The following chart, compiled from the best information available in the record, sets out the composition of the "minorities" among the defendant's salaried employees. For purposes of this chart white women are not included in either category. The chart does show that Orientals and American Indians, who (according to the defendant's 1972 affirmative action plan based on 1970 statistics) represented a combined total of 1.0 percent of the population of the Denver Metropolitan Area occupied al-

most the same number of salaried positions between 1966 and 1970 as blacks and Spanish-speaking Americans, who represented 13.1 percent of the population.

| | Total | Black & S.A. | | Orientals & Am. Indians | |
|------|-----|-----|---------|-----|---------|
| 1966 | 46 | 24 | (52.2%) | 22 | (47.8%) |
| 1967 | 51 | 27 | (52.9%) | 24 | (47.1%) |
| 1968 | 54 | 29 | (53.7%) | 25 | (46.3%) |
| 1969 | 63 | 35 | (55.5%) | 28 | (44.5%) |
| 1970 | 84 | 50 | (59.5%) | 34 | (40.5%) |
| 1971 | 110 | 74 | (67.3%) | 36 | (32.7%) |
| 1972 | 174 | 115 | (66.1%) | 59 | (33.9%) |
| 1973 | 167 | 115 | (68.9%) | 52 | (31.1%) |

13. In employing the criteria, it said as to each of the plaintiffs:

As to plaintiff Rich the court said:
We find that there were no promotions of any employees in the Engineering Department in plaintiff's salary grade during the year 1969. There was no opening for promotion for which plaintiff Rich was qualified.
As to plaintiff Tafoya the court said:
We are persuaded that the evidence shows that the named employees received promo-

highly literal interpretation to the *McDonnell-Douglas* decision, treating the criteria as absolutes. The Supreme Court, however, recognized that this was not to be the approach to all Title VII cases when it said in footnote 13 (the Supreme Court's footnote 13):

> The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.

The case at bar has substantial factual variances. *McDonnell-Douglas* was not an employee promotion case at all; it was a rehiring case. The single plaintiff (Green) had been laid off in the course of a reduction in force. He filed a lawsuit alleging that his discharge and the general hiring practices of McDonnell-Douglas were racially motivated. The reason ascribed by McDonnell-Douglas for its refusal to rehire respondent was his activist conduct in blocking the road with an automobile to prevent access to the plant, and the lock-in by placing a chain on the front door of a building. It was in that context that the Supreme Court, in holding that the plaintiff had a right to sue, laid down these criteria for a prima facie case and said that he had proven such a case and that the burden shifted to *McDonnell-Douglas* to articu-

late non-discriminatory reasons for rejecting him. As we view it, there would be no necessity in our case to point to a specific opening in a period of 90 days. The theory of the case here is that the lengthy periods in which the individuals were kept in grades as compared with others who were similarly situated raised an inference of discrimination. Furthermore, it was not necessary in view of the fact that promotions were withheld for periods of years and in view of the fact that the evaluation process was largely subjective to require plaintiffs to establish that they were at the top of the list, which list was arrived at through use of these subjective evaluations.

■ On remand the court should then, from the plaintiffs' evidence that now exists and that which will be adduced, including statistics and general qualifications, determine whether the plaintiffs have proven a prima facie case. Only after that should the court hear the defendant's evidence as to non-qualification, non-discrimination or business necessity. We emphasize again that each plaintiff need not prove that he was the most qualified person in order to be promoted. He should not have to show, in other words, why his supervisor did not certify him as being at the top of the list. Considered in this light, the court's findings that the plaintiffs failed to make out a prima facie case become

tions more than 90 days prior to the date on which Tafoya filed his charge with the EEOC. Therefore Tafoya's charge and claim like that of plaintiff Rich fails to meet criteria enumerated in *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
As to plaintiff Franklin the court said:
We are persuaded that Franklin was promoted and advanced according to his ability, job knowledge, experience and future advancement potential. From our review of the testimony, his race was not a consideration in promotion or absence of same.
As to plaintiff Langley the court said:
We find that Langley failed to establish that the company promoted others into jobs for which he was qualified.
As to plaintiffs Craig and Collier the court said:
The Millwright training program (initiated in 1969) aided Collier and Craig and others similiarly (sic) employed to advance in the company. This program and progress of

plaintiffs negates their claim of discrimination.
We further find that the plaintiffs Collier and Craig failed to establish their burden of proving that they were previously qualified to become Millwrights A and the company through past discriminatory practices had frozen or locked them into lower paying jobs without the chance for advancement.
As to plaintiff Chappell the court said:
We find that Chappell was not qualified to be an Electrician A at the time he filed the instant charge with the EEOC, that the defendant worked with and helped train Chappell for that position and when qualified he was promoted to the position of Electrician A in 1971. None of the defendant's action (sic) were discriminatory in principle or practice. Chappell has failed to carry his burden of proving that white employees were promoted to the position of Electrician A at any time during which he was qualified for that position.

highly questionable. The particular plaintiffs had long experience and were in a position in each and every instance to be considered for promotion, so when they have shown their lengthy tenure and the extent and scope of their knowledge and experience, it would appear that they have established that they were qualified.

■■■■ As to the salaried positions and the use of the totem pole, it would appear that the defendant would have the burden of establishing the fundamental fairness of this approach since it is largely subjective. Once a plaintiff has shown that he is qualified, he need only show a discriminatory impact and that he was among the class of employees who could have been considered for promotion. Defendant may, of course, rebut this prima facie showing by producing evidence of objective business reasons or necessity for its failure to promote the plaintiffs. Plaintiffs, in turn, are free to show that this was pretextual.

We finally must take up the factor of timing. The court found that in some instances there were no openings in positions for which the plaintiffs were qualified within the 90 days prior to the filing of charges with the EEOC. The court apparently read *McDonnell-Douglas* as saying that if an employer has employed no one during the 90 days preceding the filing of charges with the EEOC, it is impossible to have an unlawful employment practice committed within the time limitations of 42 U.S.C. § 2000e–5(e).[14]

■■■■ This is in relation to the *McDonnell-Douglas* criterion requiring that plaintiff show that he applied for a job for which the employer was seeking applicants. Clearly this applies to new employment and is different from an employee who is seeking promotion. The former takes place on a particular day, whereas in the promotion area it invariably arises during a lengthy period of time. Plaintiffs here challenge the entire promotion system maintaining that it continually operated so as to hold them in lower echelons. Hence, the 90 day period prior to the filing of the EEOC charges looms inconsequential in this kind of case. If proven, these charges of discriminatory refusal to promote would be violative of 42 U.S.C. § 2000e–5.

■■■■ Injunctive relief could be given against the application of the alleged discriminatory ranking system and, if proven, damages could be awarded for the past effects of that system within the two year time limitations of 42 U.S.C. § 2000e–5(g).[15] This two year limitation period is to be applied, of course, only to the extent that the district judge finds the same to be applicable to the particular fact situation. This is in recognition of the fact that the extent of the applicability of this limitations period cannot be fully foreseen by us.

**14.** 42 U.S.C. § 2000e–5(e) presently reads as follows:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . .

At the time the instant charges were filed with the EEOC, the time limitations were 90 days and two hundred ten days, respectively.

> Since all of the plaintiffs filed charges with the Colorado State Civil Rights Commission, it would appear that the two hundred ten day provision rather than the ninety day provision was applicable.

**15.** This conclusion is in accord with the general rule that has evolved in the Circuits that a plaintiff alleging a continuing violation of Title VII may file charges with the EEOC at any time during which the alleged continuing violation has taken place. *See EEOC v. Western Publishing Co.,* 502 F.2d 599 (8th Cir. 1974); *Macklin v. Spector Freight Systems, Inc.,* 478 F.2d 979 (D.C.Cir.1973); *Belt v. Johnson Motor Lines, Inc.,* 458 F.2d 443 (5th Cir. 1972); *Bartmess v. Drewrys U.S.A., Inc.,* 444 F.2d 1186 (7th Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971).

The Tenth Circuit has previously acknowledged this rule in *Molybdenum Corp. of Amer-*

The claim under 42 U.S.C. § 1981 is not subject to the 90 day filing provision applicable to the claim under the EEOC. The trial court did not consider this in its findings due perhaps to the fact that *Johnson v. Railway Express Company, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), had not then been decided. Nevertheless, the court must reexamine its ruling in the light of *Johnson.*

\* \* \* \* \* \*

In sum, it was the determination of the classes which produced the result because this led inevitably to the declassification and to the trial of the case on the basis of the rights of the individual plaintiffs. It also led to a narrow as possible scope of discovery and, as we have seen, this stifles the object of the statute and is contrary to the cases which have considered the question. However, the problem was compounded by allowing the defendant to try its defense with unlimited breadth and scope and according to its theories and concepts.

Finally, the court's full acceptance of the defendant's concepts of the case and its rejection of the plaintiffs' served to curtail plaintiffs' efforts to vindicate their rights.

Accordingly, the judgment must be reversed and the cause remanded with directions to the court to reconsider the class action question, to reconsider plaintiffs' request for discovery and, of course, to evaluate the rights of the plaintiffs in the light of the evidence produced. It is not necessary to retravel the ground that has been covered. The proofs can be supplemental to those heretofore received. At the same time, the case is to be reconsidered, and the probative value of the evidence heretofore offered judged anew and in the light of the comments contained in this court's opinion.

Accordingly, the judgment of the district court is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

### APPENDIX A

### INDIVIDUAL BACKGROUNDS OF THE PLAINTIFFS

A. Jewel Rich

First hired August 6, 1957 as an associate engineer, Mrs. Rich was promoted on January 10, 1966 to full Engineer. She received merit increases approximately once a year, but did not receive another promotion during the remaining time that she worked for the company. She had a Bachelor's Degree in Fine Arts and had had several years' experience in engineering design prior to starting work for the Martin Company. Her rating was the lowest in her department, section and salary grade of 43. On the totem pole she was shown to have more experience than all except two of the 21 employees of her grade. She had more seniority and more formal education than about half. However, neither education, seniority nor experience were the criteria which were considered for promotion in and of themselves.

Her performance was not evaluated highly by her supervisors, all of whom were white and male. At the same time, she was shown to have performed her work on time and free from substantial error; she had creative ability and found some of her tasks boring; her evaluation rating showed that she needed technical improvement. Notwithstanding this, she was recommended in October 1963 for promotion and again in August 1965, but it was not until January 1966 that the promotion came about. Her supervisor

---

*ica v. EEOC*, 457 F.2d 935 (10th Cir. 1972). Like the *McDonnell-Douglas* case, this case involved a refusal to hire, rather than a refusal to promote. The plaintiff had applied for employment on two separate occasions, and he was rejected both times, ostensibly for the reason that he had poor vision. The Tenth Circuit held that the refusal to hire was not actuated by a continuous employment practice "which would call for a tolling of the statute as in *Bartmess v. Drewrys U.S.A., Inc.*" *Id.* at 936. The court, rather, held that the refusals to hire were separate and distinct acts, one of which was within the 90 day period.

did recommend in May 1968 that she be given more responsibility once an opening occurred. At trial, two of her former supervisors said that she was deficient in her knowledge of "load paths" or structural design capability. Mr. Coan testified that the quality of her work was good and that her accuracy was sufficient, but that she just wasn't good enough for any grade better than that which she occupied, which was 43. He stated that although she did not suffer in comparison with other employees in areas such as accuracy, prompt performance and fidelity to design criteria, it was in subjective areas such as attitude, initiative and dependability that she suffered.

The workings of the totem pole were described by Mr. Coan: He, as unit chief or head, would meet with the group engineers to discuss and rate their subordinates. Output, dependability and reliability were the criteria. Mr. Anschicks, assistant to the section chief, added that employees were rated in the order of their value to the company. The unit head after meeting with the group engineers would then meet with the section chief to go over the ratings, but the section chief in essence ratified the ratings of the unit heads and group engineers. They all agreed that Mrs. Rich's low rating was proper.

In March 1970, several people in Mrs. Rich's department were laid off. As a result of her low rating on the totem pole, she was one of them. When she protested her section chief, Mr. Pratt, told her that the alternative would be for her to take a job in the publications department as a creative illustrator. Although the salary and rating were the same, she considered this a downgrade, so she met with Vice-President Purdy, and she felt that he indicated another job would be found. He testified, however, that there was a misunderstanding; that he had only urged her to take the illustrator job. She refused this and was laid off. After that, the number of people working on her project, "Skylab" was doubled.

Mr. Anschicks testified that there were no promotions in Mrs. Rich's department during 1969, and that there were only two in 1968. However, the totem pole revealed that four people were hired in a grade above hers between September 3 and October 6, 1969.

The trial court found (as to Rich):

There were no openings for promotions in 1969, notwithstanding that the totem pole revealed that four persons were hired in the grade above hers (between September 3 and October 6, 1969). The court further found that the company did not discriminate against Mrs. Rich at any time prior to her filing the charge and that she was promoted in accordance with her abilities and qualifications. She was at the bottom of the totem pole and the decision to lay her off was reviewed at several levels. The creative illustrator job was the only one available for her at the time. She chose to reject that. The company did not discriminate against Mrs. Rich in discharging her.

### B. Tommy Franklin

Hired August 18, 1959 as an Accountant B, Franklin had then completed a two year course in accounting at the Barnes school and had taken correspondence courses in accounting. He had also enrolled in Regis College in 1957 and was attending Regis part-time at the time that he was hired. He obtained his degree from Regis in 1963. He was promoted to Accountant A on July 3, 1961, to Senior Accountant on September 30, 1963, and to Associate Analyst, his first salaried position, on August 7, 1967, and then to Specialist Finance on February 1, 1971.

Franklin's performance evaluations were average to good. In July 1968, his evaluation as Associate Analyst showed that he had made great improvements both in quantity and quality of work. His supervisor in 1966–67 had stated that he should learn to use control techniques and should learn all facets of the billing operation. His supervisor, Mr. Wasserstein, testified that he did not feel confident in Franklin's work; that

Mr. Franklin was good at his job, cost billing, but was not very good at logic or catching errors. His next supervisor, Mr. Critchfield, said that he was better at repetitive jobs than the new tasks. There were no promotions over Franklin during 1969. However, two employees were promoted to his same grade. In March 1969, Critchfield was promoted from grade 43 to 45, but no one was promoted to fill that opening.

Wasserstein's testimony was that he made out employee performance evaluations based on his impression as to how the work was being done. There were no written guidelines for a determination of promotability. It was apparently unnecessary for an opening to exist in order for an employee to be promoted. According to Wasserstein, when Franklin was promoted to a salaried position in 1967, the position he occupied did not change. The section chief determined who got raises and promotions. One of Franklin's contentions was that he was prevented from getting cross-training in other areas of the department, whereas white employees received this. This fact prevented him from getting a promotion. However, the supervisors testified that there was no regular program of cross-training. This was done when there was time, but there was not often time. At the same time, they testified that Franklin had the same opportunities as everybody else.

The trial court found:

Franklin was promoted according to his ability, job knowledge, experience and future advancement potential. Franklin was given the same opportunity as his co-workers for cross-training. Defendant did not discriminate against Franklin on the basis of race either in promotion or opportunities for training.

C. Jose Tafoya

Hired as an electrical mechanic on June 28, 1957, he was in November of that year either reclassified or promoted to Analytic Associate. The evidence is unclear as to whether this was a reclassification or promotion.

On March 16, 1961, he was promoted to Engineer E & E (grade 41), a salaried position.

April 6, 1964, he was demoted in the course of a reduction in force to Electronic Developer. November 23, 1970, he was promoted to Analytic Associate (grade 41).

In March 1973, he was demoted in lieu of layoff to Developer.

He was considered for promotion to Assistant Foreman in March 1969, but an employee who supposedly had more experience was chosen ahead of him. He had previous supervisory experience, although he had not been formally given a foreman's position.

In March and April 1969, several employees were promoted to salaried positions from Tafoya's department. Mr. Seal testified that two of these were asked for by name by the department to which they were promoted. Of the four named by Tafoya as being promoted over him, two were structural mechanics, according to Mr. Seal, with different skills.

Tafoya was shown to have been a good worker and had received good evaluations consistently. They said, however, that in 1969 Tafoya's attitude deteriorated and he did not stick to his job. However, in June 1969 he is shown to have received an excellent rating with respect to his attitude both toward fellow employees and toward supervisors. Job experience, attitude and previous performance were described as the criteria applicable to promotions.

Tafoya maintained that he was harassed and intimidated following the filing of charges with the EEOC. The day following the service of charges, which date was January 8, 1970, Tafoya and his supervisor, Mr. Fischer, got into an argument and the supervisor accused Tafoya of not being on the job on time and not working hard enough. The project that he was working on had to satisfy a deadline. He was transferred to another job, and Mr. Baylis, the manager of the Industrial Relations Department, called a

meeting. Tafoya, Fischer, the Director, of Employee Relations, and some other people were present. According to Baylis this meeting was called merely to determine what happened. Tafoya believed that the meeting was meant to intimidate him and, according to him, he was not allowed to tell his side.

The trial court found:

Tafoya had named several employees who were promoted over him. These promotions took place more than 90 days prior to his filing charges with the EEOC. According to the court, he failed to meet the criteria of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1]

The court further found that the defendant made promotions based on a bona fide promotion system and that there was no reason to believe that Tafoya's not being promoted was due to national origin. The court also found that the holding of the meeting was not for the purpose of unlawful harassment or retaliation for Tafoya's having filed a charge with the EEOC.

### D. John Langley

First hired June 6, 1958 as an E & E Fabricator, in 1959 he was promoted to Developer E & E. During two brief periods in 1964 and 1966, he was demoted as a result of a reduction in force. Otherwise, he remained a Developer until April 24, 1972, when he was promoted to a salaried position, Manufacturing Engineer. In 1973, he was laid off instead of taking a demotion to Developer. The termination was not in issue.

Langley's evaluations were consistently good. They contain statements that he was a good employee, dependable, who did an outstanding job. Mr. Seal, the general foreman, testified that Langley was a very good employee, but that he did not think that he would make a good supervisor because he was

too quiet. Seal also said that he did not believe that Langley could direct people. Mr. Bookhamer, also a supervisor, said that Langley was promoted in 1972 because he had received on the job training as a planning engineer. This is offered as an explanation for his having remained in the position of Developer for 12 years.

The trial court found:

That Langley failed to establish that the company promoted others into jobs for which he was qualified. The court found that he was promoted in 1972 because by then he had attained the requisite qualifications. The court went on to say generally that the company policy for promoting employees from hourly jobs to salaried positions was non-discriminatory; that it was based on ability, experience, job performance and the availability of a job.

### E. Lawrence Collier and John Craig

These two men were hired in 1961 as janitors. However, Collier left about a month later for the Army, and was rehired as a janitor in August 1963. Collier was transferred August 14, 1967 to Helper in the Maintenance Department. On January 6, 1969, he was promoted to Millwright B, but was demoted to Helper on March 9, 1970. He was promoted again to Millwright B on February 8, 1971 and to Millwright A June 19, 1972. Craig was transferred to Laborer October 23, 1967. He was promoted to Helper March 18, 1968, and to Millwright B February 3, 1969. He was demoted to Helper March 9, 1970, promoted to Millwright B May 18, 1970, and promoted to Millwright A May 17, 1971.

Both of these men were high school graduates, and Craig had taken college courses while working at Martin. The position of janitor was conceded to be a blind alley. In order for an employee to be promoted he had to be transferred to laborer or helper so that he could

1. Presumably, the trial court was referring to the requirement spoken of in the case that a plaintiff show a position was available. The trial court presumes that since no one else was promoted within 90 days, no position was available, and therefore no discriminatory act took place within 90 days before the charge was filed.

progress in the trade classifications, such as Millwright, Carpenter, etc. Collier requested such a lateral transfer August 21, 1963, soon after he was rehired by the company. He asked for another transfer in December 1966 as did Craig, but neither received a transfer until the latter half of 1967, at which time they were finally offered Millwright B jobs. At the end of December 1968, they accepted, though Collier had signed a preference form indicating that his first choice was Carpenter B. At the end of January 1969, Collier was offered and refused promotion to Millwright A.[2]

In 1969, the company established a training program for millwrights. Both Collier and Craig enrolled, but dropped out for a couple of months and were reinstated and finished the course. It included eight weeks of remedial reading and arithmetic, general skill related courses, a term of specific skills courses and on the job training. Collier and Craig said they dropped out because the training was not helpful and the company was hiring white Millwright A people from outside. Prior to their being offered Millwright A positions, Collier and Craig were offered jobs as stockkeeper and vehicle operator. This was in line, according to Mr. Ferguson, Manager of Plant Services, with the company policy of offering all helpers a stockkeeper job when it became available whether or not there had been a request by the employee. In May 1970, after having been demoted to Helper, Collier was again offered a Millwright B position, but he turned this down because he had been unofficially offered a carpenter job. Later he accepted the Millwright B job.

Collier testified that the company's policy at the time he was hired was to employ blacks and older white men as janitors, whereas young white men were initially hired as helpers and laborers. It was the position of the company, as expressed by Mr. Ferguson, that Collier

and Craig were not qualified for promotions to Millwright A until they were actually promoted, but the record shows that no blacks held the Millwright A position until sometime in 1971. However, by 1972 all of the black Millwright B's had been promoted to A's. There were 35 Millwright A's between January 1966 and January 1973. Twenty-eight were white. Of these 28 white Millwright A's, 11 were hired with no previous experience as B's. All seven of the black Millwright A's were promoted from the B rank. For the whites who were promoted from Millwright B, 15 months was the average time spent in B, whereas the black Millwrights who were promoted had to spend 68 months of service on the average as Millwright B's.

The trial court found:

That Collier and Craig failed to prove that they were qualified for the Millwright A position before they were promoted. Meanwhile, they were trained on the job. The fact that there were no black Millwright A's before 1971 was due to the fact that there were no black persons who were qualified but there was no discrimination against Collier and Craig on account of race.

### F. Bobby Chappell

Hired May 15, 1957 as a janitor, he was transferred to Helper November 17, 1958 and promoted to Electrician B on February 15, 1960. There is one brief demotion to Helper in 1965. Otherwise, he remained as an Electrician B until May 17, 1971, when he was promoted to Electrician A.

The performance evaluations were fairly good. He was said to be cooperative. He had been given two trial periods as an A Electrician before he was promoted. On each occasion he was told he was not qualified. The testimony of Mr. Ferguson was that he was unable to hook up properly or to work very fast. Mr. Ferguson testified that all B Electri-

---

2. Collier does not explain why he refused this promotion. Defendant does not explain why Collier was considered qualified for Millwright A in January 1969, but not qualified before his promotion in June 1972.

cians seeking promotions went through the trial period.

Between January 1966 and January 1973, there were 44 A Electricians. Five of these were black and four were Spanish-American. No black or Spanish-American Electrician A's were hired without previous experience as an Electrician B, but of the 35 white Electrician A's, 15 were hired without previous B experience. The average number of months spent as a B Electrician for the remaining 20 whites was 24 months. The average months spent in the B classification for the black and Spanish-American A Electricians was 47 months. Five of the nine blacks and Spanish-Americans were not promoted until 1971 or after. Since 1970, the number of B Electricians has decreased, whereas the number of A Electricians has increased.

The trial court found:

That Chappell was not qualified as an Electrician A at the time he filed charges with EEOC. He failed to show that white employees were promoted to that position at any time during which he was qualified. There was no discrimination against Chappell on the basis of race.

APPENDIX B

CHART I-A

Merit Increases

| Year | Minority Base | No. Increases | % | Non-minority Base | No. Increases | % |
|---|---|---|---|---|---|---|
| 1966 | 46 | 41 | 89 | 3480 | 2543 | 73 |
| 1966* | 24 | 19 – 24 | 79.0-100 | 3502 | 2565-2560 | 73.2-73.1 |
| 1967 | 51 | 42 | 82 | 3441 | 2516 | 73 |
| 1967* | 27 | 18 – 27 | 66.7-100 | 3465 | 2540-2531 | 73.3-73.0 |
| 1968 | 54 | 41 | 77 | 3230 | 2378 | 74 |
| 1968* | 29 | 16 – 29 | 55.2-100 | 3255 | 2403-2390 | 73.8-73.4 |
| 1969 | 63 | 62 | 98 | 3350 | 3038 | 91 |
| 1969* | 35 | 34 – 35 | 97.1-100 | 3378 | 3066-3065 | 90.8-90.7 |
| 1970 | 84 | 70 | 83 | 4264 | 3157 | 74 |
| 1970* | 50 | 36 – 50 | 72.0-100 | 4298 | 3191-3177 | 74.2-73.9 |
| 1971 | 110 | 69 | 63 | 4371 | 2583 | 59 |
| 1971* | 74 | 33 – 69 | 44.6-93.2 | 4407 | 2619-2583 | 59.4-58.6 |
| 1972 | 174 | 138 | 79 | 4734 | 3670 | 78 |
| 1972* | 115 | 79 – 115 | 68.7-100 | 4793 | 3729-3693 | 77.8-77.0 |

In each unstarred year, the minority base includes non-black and non-Spanish-American minorities.
In each starred year, the minority base includes only black and Spanish-American employees; other minorities are included in the non-minority base.
The number of increases and the percentages for both minorities and non-minorities are given as a possible range.

CHART I-B

Promotions

| Year | Minority Base | No. Increases | % | Non-minority Base | No. Increases | % |
|------|---------------|---------------|---|-------------------|---------------|---|
| 1966 | 369 | 65 | 18 | 5943 | 724 | 12 |
| 1966* | 323 | 19 - 65 | 5.9-20.1 | 5989 | 770-724 | 12.8-12.1 |
| 1967 | 338 | 45 | 13 | 5557 | 593 | 11 |
| 1967* | 296 | 3 - 45 | 1.0-15.2 | 5599 | 635-593 | 11.3-10.6 |
| 1968 | 297 | 75 | 25 | 5005 | 604 | 12 |
| 1968* | 255 | 33 - 75 | 12.9-29.4 | 5047 | 646-604 | 12.8-12.0 |
| 1969 | 368 | 117 | 32 | 5280 | 916 | 17 |
| 1969* | 321 | 70 - 117 | 21.8-36.4 | 5327 | 963-916 | 18.0-17.2 |
| 1970 | 383 | 115 | 30 | 6030 | 845 | 14 |
| 1970* | 331 | 63 - 115 | 19.0-34.7 | 6082 | 897-845 | 14.7-13.9 |
| 1971 | 489 | 152 | 31 | 6270 | 994 | 16 |
| 1971* | 428 | 91 - 152 | 21.3-35.5 | 6331 | 1055-994 | 16.7-15.7 |
| 1972 | 581 | 184 | 32 | 6795 | 928 | 14 |
| 1972* | 491 | 94 - 184 | 19.1-37.5 | 6885 | 1118-928 | 16.2-13.5 |

APPENDIX C

CHART II

Promotions Hourly to Salary

| Year | No. Promotions | Black | S.A. | % Black and S.A. | % of Hourly Work Force Black & S.A. |
|------|----------------|-------|------|------------------|-------------------------------------|
| 1966 | 71 | 2 | 1 | 4.2% | 11.0% |
| 1967 | 65 | 1 | 2 | 4.6% | 11.2% |
| 1968 | 65 | 2 | 2 | 6.1% | 11.2% |
| 1969 | 96 | 2 | 4 | 6.2% | 12.8% |
| 1970 | 67 | 2 | 0 | 3.0% | 13.6% |
| 1971 | 107 | 4 | 7 | 10.3% | 15.5% |
| 1972 | 130 | 5 | 8 | 10.0% | 15.4% |

APPENDIX D

CHART III

A. Officials and Managers (including Supervisors)

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 627 | 9 (1.4%) | 0 | 1 ( .1%) |
| 1967 | 679 | 8 (1.2%) | 1 ( .1%) | 3 ( .4%) |
| 1968 | 677 | 7 (1.0%) | 1 ( .1%) | 4 ( .6%) |
| 1969 | 692 | 8 (1.2%) | 1 ( .1%) | 5 ( .7%) |
| 1970 | 787 | 6 ( .7%) | 2 ( .2%) | 7 ( .9%) |
| 1971 | 925 | 10 (1.1%) | 4 ( .4%) | 9 (1.0%) |
| 1972 | 972 | 12 (1.2%) | 4 ( .4%) | 17 (1.7%) |

B. Professionals

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 2964 | 65 (2.2%) | 10 ( .3%) | 13 ( .4%) |
| 1967 | 2813 | 78 (2.8%) | 9 ( .3%) | 14 ( .5%) |
| 1968 | 2607 | 79 (3.0%) | 10 ( .4%) | 14 ( .5%) |
| 1969 | 2721 . | 85 (3.1%) | 14 ( .5%) | 15 ( .5%) |
| 1970 | 3561 | 97 (2.7%) | 15 ( .4%) | 26 ( .7%) |
| 1971 | 3556 | 97 (2.7%) | 24 ( .7%) | 37 (1.0%) |
| 1972 | 3936 | 117 (3.0%) | 34 ( .9%) | 60 (1.5%) |

C. Technicians

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 364 | 11 (3.0%) | 5 (1.4%) | 11 (3.0%) |
| 1967 | 305 | 23 (7.5%) | 3 (1.0%) | 12 (3.9%) |
| 1968 | 267 | 16 (6.0%) | 3 (1.1%) | 11 (4.1%) |
| 1969 | 275 | 12 (4.4%) | 2 ( .7%) | 17 (6.2%) |
| 1970 | 275 | 17 (6.2%) | 2 ( .7%) | 13 (4.7%) |
| 1971 | 325 | 28 (8.6%) | 7 (2.1%) | 26 (8.0%) |
| 1972 | 442 | 26 (5.9%) | 7 (1.6%) | 31 (7.0%) |

D. Office & Clerical

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 960 | 577 (60.1%) | 13 (1.3%) | 29 (3.0%) |
| 1967 | 811 | 548 (67.6%) | 11 (1.4%) | 22 (2.7%) |
| 1968 | 658 | 476 (72.3%) | 11 (1.7%) | 20 (3.0%) |
| 1969 | 739 | 503 (68.1%) | 24 (3.2%) | 35 (4.7%) |
| 1970 | 778 | 574 (73.8%) | 33 (4.2%) | 52 (6.7%) |
| 1971 | 767 | 563 (73.4%) | 31 (4.0%) | 50 (6.5%) |
| 1972 | 716 | 558 (77.9%) | 23 (3.2%) | 48 (6.7%) |

E. Craftsmen (Skilled)

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 613 | 16 (2.6%) | 21 (3.4%) | 26 (4.2%) |
| 1967 | 576 | 12 (2.1%) | 15 (2.6%) | 25 (4.3%) |
| 1968 | 497 | 12 (2.4%) | 19 (3.8%) | 22 (4.4%) |
| 1969 | 527 | 17 (3.2%) | 22 (4.2%) | 30 (5.7%) |
| 1970 | 485 | 17 (3.5%) | 19 (3.9%) | 26 (5.4%) |
| 1971 | 545 | 17 (3.1%) | 24 (4.4%) | 37 (6.8%) |
| 1972 | 546 | 24 (4.4%) | 31 (5.7%) | 42 (7.7%) |

F. Operatives (Semi-Skilled)

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 567 | 156 (27.5%) | 56 (9.9%) | 75 (13.2%) |
| 1967 | 496 | 82 (16.5%) | 44 (8.9%) | 68 (13.7%) |
| 1968 | 411 | 39 (9.5%) | 35 (8.5%) | 52 (12.6%) |
| 1969 | 519 | 100 (19.3%) | 46 (8.9%) | 56 (10.8%) |
| 1970 | 331 | 64 (19.3%) | 30 (9.1%) | 47 (14.2%) |
| 1971 | 459 | 81 (17.6%) | 49 (10.7%) | 74 (16.1%) |
| 1972 | 529 | 123 (23.2%) | 53 (10.0%) | 83 (15.7%) |

G. Serviceworkers (Janitors)

| Year | Total | Female* | Black | S.A. |
|------|-------|---------|-------|------|
| 1966 | 217 | 42 (19.3%) | 29 (13.4%) | 34 (15.7%) |
| 1967 | 210 | 41 (19.5%) | 28 (13.3%) | 41 (19.5%) |
| 1968 | 184 | 37 (20.1%) | 24 (13.0%) | 29 (15.8%) |
| 1969 | 172 | 40 (23.2%) | 21 (12.2%) | 33 (19.2%) |
| 1970 | 193 | 45 (23.3%) | 23 (11.9%) | 36 (18.6%) |
| 1971 | 180 | 44 (24.4%) | 19 (10.5%) | 37 (20.5%) |
| 1972 | 198 | 49 (24.7%) | 23 (11.6%) | 35 (17.7%) |

*Number of females includes females of all races.