Theodore A. KENTROTI,
Plaintiff-Appellant,

v.

FRONTIER AIRLINES, INC.,
Defendant-Appellee.

No. 76–1750.

United States Court of Appeals,
Tenth Circuit.

Argued Nov. 15, 1977.
Decided Oct. 20, 1978.

Thad M. Oviatt, Wheat Ridge, Colo. (Skelton, Oviatt & O'Dell, Wheat Ridge, Colo., on the brief), for plaintiff-appellant.

E. Lee Dale, Denver, Colo. (Dawson, Nagel, Sherman & Howard, Denver, Colo., on the brief), for defendant-appellee.

Jacob I. Karro, Atty., U. S. Dept. of Labor, Washington, D. C. (Carin Ann Clauss, Sol. of Labor, Carl W. Gerig, Jr., Acting Associate Sol., Paul D. Brenner, Atty., and Tedrick A. Housh, Jr., Regional Sol. U. S. Department of Labor, Washington, D. C., on the brief), for The Secretary of Labor as amicus curiae.

Before SETH, Chief Judge, and HOLLOWAY and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff Theodore A. Kentroti , brought this suit for alleged violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.,* (ADEA),[1] against defendant Frontier Airlines, Inc. He asserted four claims under the ADEA: (1) that defendant wrongfully denied him a seniority number at the time he was hired effective October 2, 1967, and at all times thereafter denied him a seniority number despite numerous requests therefor, because of his age (45 at the time of his employment by defendant) in violation of § 623(a)(1); (2) that the defendant made a wrongful segregation or classification of plaintiff by not treating him as a pilot entitled to a seniority number because of his age, in violation of § 623(a)(2); (3) that plaintiff was wrongfully terminated without good cause and because of age by his discharge on March 1, 1975; and (4) that his discharge was discriminatory and in retaliation for oral and written complaints of age discrimination made by plaintiff, and thus violative of § 623(d). The trial court denied all four claims for various reasons and dismissed the complaint and action, and plaintiff appeals.

We will discuss the facts and the record evidence as we treat plaintiff's appellate contentions. First, we deal with claims of procedural error which will place the case in somewhat better focus.

---

1. The ADEA was enacted on December 15, 1967, and became effective 180 days thereafter. The relevant portions of the statute are §§ 623(a)(1) and (2) and 623(d) which provide as follows:

> § 623. Prohibition of age discrimination
> Employer practices
> (a) It shall be unlawful for an employer—
> (1) to fail or refuse to hire or to discharge any *individual or otherwise discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;
>
> \* \* \* \* \* \*
>
> (d) It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

## I

### The procedural issues

Much of the factual background was covered by a lengthy stipulation set out in the pretrial order. There was also considerable testimony and documentary evidence offered by the plaintiff. At the conclusion of the plaintiff's case, the defendant moved for dismissal on the ground that the plaintiff had failed to establish a *prima facie* case. The trial judge reserved his ruling on the motion. At the conclusion of the presentation of all the evidence and after arguments were made, the court then announced its decision orally.

The court stated that the ruling on the motion to dismiss had been reserved and that the court was granting the motion. With respect to findings and conclusions on the evidence, the court then reviewed the issues, discussed the stipulation and the evidence in some detail, and stated findings and conclusions against the plaintiff on all four of his claims. The court held that claims (1) and (2) were barred by the two-year limitation of 29 U.S.C. § 255(a). The judge also concluded by stating that in his view the plaintiff had not carried the burden of proof required by the statute and that the complaint and action were dismissed and judgment would be entered for the defendant, with costs.

■ The plaintiff claims that there was procedural error in that the trial judge considered the defendant's evidence in reaching his findings and conclusions. It is true that the findings and conclusions, together with the record, demonstrate that the court considered the whole of the evidence—plaintiff's and defendant's—but this was clearly proper. The reservation of the ruling was permissible under Rule 41(b), F.R. Civ.P., and indeed has been said to be the preferable practice in some circumstances. See *White v. Rimrock Tidelands, Inc.*, 414 F.2d 1336, 1340 (5th Cir.). Where the ruling is reserved and then later the court rules after all the evidence is in, the court should look to all the evidence in deciding the case on the merits. *A. P. Hopkins Corp.*

*v. Studebaker Corp.*, 496 F.2d 969, 971 (6th Cir.); see *K. King & G. Shuler Corp. v. Petitioning Creditors*, 427 F.2d 689, 690–91 (9th Cir.); *Weissinger v. United States*, 423 F.2d 795, 797–98 (5th Cir. en banc). And findings of fact made as in this case as a predicate for a final dismissal and judgment for defendant are like other findings—they are not to be set aside on appeal unless clearly erroneous. Id. at 798.

■ One further word should be added on the procedural posture of the case. Arguments are made about whether a *prima facie* case was made under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. The rules laid down there by the Supreme Court are controlling as to establishing a *prima facie* case of racial discrimination, and we feel they apply to this age discrimination case. See *Laugesen v. Anaconda Co.*, 510 F.2d 307, 311–12 (6th Cir.). Those guidelines deal with establishing a *prima facie* case of discrimination, shifting of the burden of proof to defendant to show a legitimate, non-discriminatory reason for the challenged action, and the opportunity of the plaintiff to rebut the defendant's showing by demonstrating that the reason assigned as justification for the defendant's action was pretextual and in fact a coverup for discriminatory action. *McDonnell Douglas, supra,* 411 U.S. at 802–05, 93 S.Ct. 1817.

A *McDonnell Douglas prima facie* showing is not the equivalent of a factual finding of discrimination; rather, it is simply proof of actions by an employer from which discriminatory animus may be inferred. *Furnco Construction Corp. v. Waters,* —— U.S. ——, ——, 98 S.Ct. 2943, 57 L.Ed.2d 957. And to dispel the adverse inference from such a *prima facie* showing, the employer need only articulate some legitimate non-discriminatory reason for his actions. Id. at ——, 98 S.Ct. 2943.

It is true that the trial judge stated at the end of the trial that he was granting the motion made by the defendant to dismiss for failure to establish a *prima facie* case. We feel, however, that the judge's findings and conclusions as a whole show

that he considered and agreed with the company's showing of legitimate, non-discriminatory reasons for its actions. By considering and agreeing with such reasons outlined in the defendant's proof, we do not infer in this instance that the court was recognizing that a *prima facie* case had been made. We do not believe it critical here to determine which process of reasoning the trial court followed—rejecting the plaintiff's case because of *prima facie* showing had not been made, or holding that the defendant prevailed because the evidence demonstrated legitimate, non-discriminatory reasons for the defendant's actions. We feel the judge was likely focusing on the latter point and then holding that the plaintiff had failed to carry the overall burden of proof. In any event, there was no prejudice from the procedure he followed.[2]

## II

*The trial court's findings and conclusions*

The trial court's findings and conclusions were made orally after the conclusion of presentation of the evidence and arguments. (III R. 2–13). The court said that its ruling had been reserved on the defendant's motion to dismiss for failure to establish a *prima facie* case, made at the close of plaintiff's case in chief, and that the court was now granting the motion.

The court stated that "with respect to the findings and conclusions on the evidence," first of all jurisdiction of the matter was admitted, it exists under the ADEA, plaintiff has complied with all conditions precedent to suit, and the suit is timely insofar as it relates to plaintiff's discharge in March, 1975. Further the court stated that the facts agreed on in the pretrial order were incorporated by reference, including the fact that plaintiff had been employed by defendant on October 1, 1967, when he was 45 years of age.[3]

The court said it was clear that no seniority number was assigned to plaintiff. The application for employment as sought and granted was for a combination position of flight and ground instructor. Plaintiff indicated he would only accept employment in the Denver area and he desired to be stationed there.

The court found that defendant then had a collective bargaining agreement with the Airline Pilots' Association International (ALPA), that a seniority system was established in the agreement, and that the agreement provides that seniority begins to accrue from the date a pilot is first employed as an airline pilot. The seniority system governs promotion, demotion and retention on reduction in force, *inter alia.*

The court stated that a determinative question is whether plaintiff was a pilot within the meaning of the contract, that read literally perhaps you could include plaintiff as a pilot, but that the definitions have to be read in terms of the entire agreement, its purpose and context.[4] The word "pilot" is defined as including first pilot, first officer and second officer. The

---

2. In *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 347 (10th Cir.), we did state that the trial court should first determine whether the plaintiff had proved a *prima facie* case and, only after that, should the court hear the defendant's evidence as to a non-discriminatory or business necessity.

In any event, we do not feel that any prejudice to the parties resulted from the court's procedure here. The order of proof outlined by the *Rich* opinion was followed, and the court gave full opportunity to both parties to address the issues as outlined in *McDonnell Douglas*, and they were decided for the defendant on a basis recognized by *McDonnell Douglas.*

3. At that time the ADEA was not enacted and it did not become effective until June 13, 1968. However, the trial court did not treat the issues as affected by this fact. The controversy continued over the refusal of a seniority number to the plaintiff and other complaints made by the plaintiff during the period when the statute was in effect. It appears that the court was holding that in any event there was no violation of the principles laid down by the Act at the time of hiring or later.

4. The definitions of the agreement of paramount importance and effective in 1967–68 when the plaintiff was employed read as follows (Plaintiff's Ex. 1, pp. 1–2):

DEFINITIONS:

SECTION 2. The terms as used in this Agreement shall be construed as follows:

(a) The term "Pilot" as used herein, shall include and mean first pilot, first officer and second officer as defined herein.

(b) The term "First Pilot", as used herein, shall mean a pilot who is responsible for the

court said it is clear that the agreement refers to flight crews and, in terms of the context of the agreement, it was the court's finding and conclusion that pilots within the meaning of the agreement are line pilots, "those who fly payloads consisting of passenger and cargo on regularly assigned routes for the company." (III R. 5). The seniority provisions in the 1967–68 contract are also reproduced in the margin.[5] The court found that the evidence does not show that the plaintiff was a pilot within the bargaining unit governed by the contracts at any relevant time. Thus the court said that the seniority system was inapplicable to the terms and conditions of plaintiff's employment. (III R. 5).

The court found that the evidence was clear that the plaintiff was qualified by experience to do the work assigned to a ground instructor and later flight instructor, and he did perform adequately the functions expanded to include those of one called a "check airman." It was the job of a check airman to test proficiency of flight personnel by simulator tests and in-flight tests of first pilots or captains and also co-pilots.[6]

It was found that the union demanded that there be a peer group evaluation of pilots employed by defendant. The union was concerned about the defendant's following the example of other airlines—at least one other line—in developing a training and evaluation section separate from the line pilots. The union was concerned that plaintiff may have been the first of others of the same group—persons brought in to perform the training and evaluation functions without serving or being available

manipulation of, or who manipulates, the flight controls of an aircraft while under way, including take-off and landing of such aircraft, and who is properly qualified to serve as, and holds a currently effective airman's certificate authorizing him to serve as such pilot.

(c) "Second Officer" means a pilot who is the third flight deck crew member and whose duties as a member of the flight crew are to assist the captain and first officer in the analysis, operation and monitoring of the mechanical and electrical systems of the aircraft, to inspect the aircraft before flight and who is properly qualified to serve as and holds currently effective airman's certificates authorizing him to serve as such second officer, including a commercial pilot's license and instrument rating and flight engineers' certificate.

(d) The term "First Officer" as used herein shall mean a pilot, any part of whose duty is to assist or relieve the first pilot in the manipulation of the flight controls of an aircraft while under way, including take-off and landing of such aircraft, and who is properly qualified to serve as, and holds a currently effective airman's certificate authorizing him to serve as such first officer.

(e) The term "Pilots Division", as used herein, shall mean that portion of a route over which a pilot is regularly scheduled or alternate thereof.

5. The relevant seniority provisions of the 1967–68 contract appear in Section 15 and read as follows (Plaintiff's Ex. 1, pp. 14–15):

SENIORITY:

SECTION 15. (a) Seniority as a pilot shall be based upon the length of service as a pilot with the Company (or with other Companies whose operations have been taken over by the Company prior to the signing of this Agreement except as otherwise provided for in this Agreement.)

(b) Seniority shall begin to accrue from the date a pilot is first employed by the Company as an air line pilot and shall continue to accrue during such period of employment except as otherwise provided in this Agreement. When two or more pilots are employed on the same date, they shall be placed on such seniority list according to their age; i. e., the oldest pilot shall be given the lowest number. The seniority list as drawn up and agreed to by a majority of the pilots of the Company in a Memorandum of Agreement dated May 5, 1950, will remain in effect and be considered the original seniority list for the pilots of Frontier Airlines, Inc.

(c) Seniority shall govern all pilots in case of promotion and demotion, their retention in case of reduction in force, their reemployment after release due to reduction in force and their choice of vacations and vacancies, provided that the pilot's flying qualifications are sufficient for the conduct of the operation to which the pilot is to be assigned.

(d) Any pilot once having established a seniority date hereunder shall not lose that date except as provided in this Agreement.

6. The plaintiff indicated that he performed simulator checks of both captains (first pilots) and first officers and checks of first officers in the plane; however he said he never did line checks on a passenger-full route for either a pilot or copilot and never did a proficiency check of a captain in an airplane. (I R. 92).

to serve as line pilots. The union's demand was reflected in bargaining for the next contract to cover the period March 1969 to March 1971. Section 7(c) of that contract required that pilots performing hood checks and line checks for captains had to be persons on the seniority list with one year of line flying on a probationary basis.

The court found that the plaintiff did not meet those conditions, this was a cause of concern to him, and he did request protection by being assigned a seniority number, which was refused. The union expanded its demand and the next contract for the period from May, 1971 to May, 1973, required that proficiency checks be made for captains, and for pilots being promoted to captain, by pilots who are or have been on the pilot system seniority list and have satisfactorily completed one year of line flying on a probationary status, which excluded the plaintiff.

It was found that the company attempted to get a formal contract interpretation from the union to protect the plaintiff, which the union refused to do. It opposed any amendment to the contract, but said "unofficially" that it had no objection to present policies with present personnel; the union, however, wanted the contract requirements to govern any future cases.

Further the court found that in February, 1975, it was clear that there was economic justification for a reduction in force. There was first a decision to discharge someone else and then the decision was changed and the plaintiff was discharged.

The court found several justifications for that decision: first, the plaintiff was the least useful in terms of flexibility because he was not a line pilot; second, the company was in the position that the union might have a "change of heart" and claim that the plaintiff's assignment as a check airman was a violation of the contract; and, third, that in terms of overall company seniority the plaintiff would have been removed on a seniority basis if seniority was applied company-wide and not just to the flight training department.

Finally, the court specifically rejected the plaintiff's four claims. It was held that the claim of wrongful denial, because of age, of a seniority number at the time of hiring was not proven and was barred by the two-year limitation of 29 U.S.C. § 255(a).[7] The claim of wrongful segregation or classification because of age was rejected because the plaintiff when hired was out of the bargaining unit, which was the reason for his being denied a seniority number, and this second claim was also held to be barred by the two-year limitation.

The court rejected the third claim of wrongful termination without good cause and due to age because it was found that there was no age discrimination factor in the discharge. The court considered in this regard the ages of other pilots in the training section who had been and were also on-line pilots for the defendant. Lastly, the court held that, although the evidence showed that complaints were made twice by the plaintiff to the Department of Labor and that he participated in investigations in connection with these complaints, it was not established that the termination decision was a retaliation for the plaintiff's initiation of or participation in the complaint and investigation.

Concluding that the plaintiff had not carried the burden of proof required by the statute, the court dismissed the complaint and action and entered judgment for the defendant.

### III

#### *The plaintiff's claims of error in the findings and conclusions*

*First,* the plaintiff argues that the trial court erred in ruling that he was not a pilot

7. The applicable limitations periods are provided by § 255(a) which provides that:

　(a) if the cause of action accrues on or after May 14, 1947—[suit] may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

These limitations of the Portal-to-Portal Act were expressly incorporated into the ADEA. 29 U.S.C. § 626(e).

within the meaning of the collective bargaining agreement, pointing to the provisions of Section 1 in plaintiff's Exhibits 1, 2 and 3. He says the ALPA definition of pilot does not speak in terms of job title but in terms of job function, that he often piloted planes as captain or first officer for the defendant, and thus he was a pilot for the airline and conversely an airline pilot. (Appellant's Brief 4, 9, 16–17).

The contract definitions have been set out earlier (See note 2, *supra*). They do have parts referring to one "responsible for the manipulation of and who manipulates, the flight controls of an aircraft while under way . . ." (See Section 2(b) defining "First Pilot" or Captain). And in December 1967 plaintiff did begin piloting cargo flights and later conducted numerous test flights of various aircraft following repair or maintenance work on them.

Viewing the contract as a whole we must, however, agree with the trial court's interpretation. The opening definition of the term "Pilot" says that it includes and means "first pilot, first officer and second officer" as defined by the agreement. The succeeding definitions logically fit an actual flight crew, not training personnel. Section 25(b) concerning training equipment says that "all pilots undergoing training will be removed from regular flying for the duration of the training period . . ."—a provision again not consistent with treating the plaintiff's training and checking duties as part of those of a "pilot" within the meaning of the agreement.

■ We are persuaded that the trial court was right in concluding that ". . . in terms of the context of the agreements, pilots within the meaning of [the] agreement are those who are line pilots, those who fly payloads consisting of passenger and cargo on regularly assigned routes for the company . . ." We agree with the court's resulting conclusions that the plaintiff was not a pilot within the bargaining unit and that the seniority system provided

by the contract was inapplicable to the terms and conditions of his employment.

*Second,* the plaintiff contends that in any event he was eligible for a seniority number because it was within the company's power to assign him a number, it was denied to him, the trial court failed to make any finding as to why his request for the number was refused, and the real reason was that he was discriminated against because of his age.

The agreements spelled out the seniority system in detail. (See note 5, *supra*). At the start, Section 15(a) says that "[s]eniority as a pilot shall be based upon the length of service as a pilot with the Company . . ." and the seniority provisions throughout are keyed to pilots as defined in the contract. A letter from one of defendant's officers to the union said that the plaintiff had been employed for use as an instructor and check airman and that he had been denied a seniority number on the basis he had been employed in the training department and not as a line pilot.[8] The evidence thus supports the court's finding that the seniority system was inapplicable to the plaintiff.

As to the claim that the court erred by failing to find why a seniority number was refused, we feel that the court did make its findings reasonably clear. As noted, the court referred to the contractual problem of the 1967–68 and subsequent collective bargaining agreements about giving the plaintiff a seniority number and also pointed to the position taken later by the union when it refused to make a formal interpretation of the agreement to protect the plaintiff.

■ With respect to the claimed errors in the findings, it is true that there was evidence that another employee, Mr. Actor, was given a seniority number when he came to work for the defendant in its training department. He stated, however, that it was understood in the discussions about his coming to work for the defendant that he

---

8. The letter from Mr. O'Neil, Joint Exhibit 101, stated that the denial of a seniority number to plaintiff had been ". . . on the basis that

he had been employed in the Training Department and not as a line pilot."

was going to become a line pilot eventually.[9] We note too that there was some undisputed testimony that defendant's supervisor, when rejecting the plaintiff's requests to get a seniority number, stated that he was "too old," and other similar proof.[10] And it was stipulated that the defendant did have a policy of preferring younger people for hire as pilots (V R. 27), and we recognize that the plaintiff is entitled to recover if one factor in the decision was age. See *Laugesen v. Anaconda Co.*, supra, 510 F.2d at 317. On the other hand, there were the contractual provisions noted and the letter of June 1971, referred to earlier, by which defendant's Vice President attempted to obtain a contractual interpretation from the union protecting the plaintiff. In that letter the officer stated that plaintiff had been denied a seniority number "on the basis that he had been employed in the Training Department and not as a line pilot." [11]

While the question is not free from doubt, we cannot say that the trial court's findings were clearly erroneous with respect to the denial of the seniority number at the time the plaintiff was employed and during the continuing controversy over the number.

■ *Third*, the plaintiff argues that the trial court erred in finding that he "would have been removed on a seniority basis if you applied seniority companywide instead of just in the training department." The argument is made in attacking the finding that the plaintiff had not proven that there was an age discrimination factor in his discharge.

We have considered the plaintiff's testimony concerning his discharge,[12] and the

---

**9.** It was shown by Mr. Actor's testimony that when he was hired by defendant his assignment was to train pilots and he immediately obtained a seniority number. However, he said it was understood then that he was to become a line pilot eventually. (II R. 39–40, 45).

**10.** The plaintiff testified generally as follows:

He said he had extensive military service as a pilot, including piloting of multi-engine jet aircraft. On one flight while still in the service, he met a director of Frontier who inquired about his interest in the company. This resulted in his taking retirement and getting employment with the defendant on October 1, 1967. In December, 1967, he got an Airline Transport Pilot's license from the FAA. This was required as part of the requirements for his job. The back-dated application he made, as requested by the company, was for the position of "Flight Instructor, Ground Instructor." He thought he was primarily being hired as a pilot. However, he was doing primarily work as an instructor in a simulator on the ground.

Plaintiff asked when he would start flying on a regular basis along with the other check airmen in the training department. He told his supervisor, Mr. Burson, he wanted to fly, and that if it took a seniority number, he would like to pursue this, but Mr. Burson said he was "too old." The plaintiff had said that he suggested he would fly the line for a year and qualify. His conversations were continuous about a seniority number.

He was responsible on check flights for manipulation and control of the plane, but he was not allowed to check captains. He never had that function of giving line checks during an actual regular flight, although he wanted that

function which check airmen performed. He never gave proficiency checks to the captain or first pilot, but did give checks to co-pilots or first officers in the plane. The plaintiff said he was assigned to fly several contract flights where he flew as the pilot or captain.

Mr. Burson, the plaintiff's supervisor, did not testify, and there was no denial of the making of statements attributed to him that the plaintiff was "too old" for a seniority number.

**11.** While the letter to the union was written in June 1971, some time before this suit was filed, at that time there had been complaints made by the plaintiff to the Department of Labor of age discrimination and these complaints were known to Mr. O'Neil and the company. (I R. 54, 60).

**12.** With respect to events surrounding his termination the plaintiff testified generally as follows:

The plaintiff described having made several complaints to the Department of Labor on age discrimination. Finally he made an official complaint in February, 1975, and about two weeks later received a letter of termination effective March 1, 1975. He was told he was being terminated because he did not have a seniority number and was junior in comparison with all the people in the training department who had numbers. However, he said he was one of the senior instructors compared to several others in the department.

He further testified that he was being compared with instructors in the training department and the entire seniority list. Although he had some seniority in the training department

defendant's evidence on the issue. The finding that the reduction in force necessitated by economic conditions was reflected in the decision to remove one person from the training department is not challenged on appeal. There was testimony from Mr. Robins, the plaintiff's supervisor at the time of his discharge, that the plaintiff was the logical person for termination because he had the lowest seniority with the company in that particular department. Further Mr. Robins gave reasons for the plaintiff's being designated for dismissal, including his unavailability to do checks of captains. (II R. 108–112). Mr. Robins also testified that he did not know about the plaintiff's recent complaint to the Department of Labor when the plaintiff's termination was announced, a fact which plaintiff's testimony contradicted. Mr. Robins said that he knew of the plaintiff's earlier complaint in the early '70s or about 1971, but that this did not influence his decision on the termination (in February, 1975) or in assigning work to the plaintiff. In sum, the proof was in conflict but there was evidence supportive of the defendant's position on the claims of a discriminatory and retaliatory discharge. Again we cannot say the findings for the defendant on these claims were clearly erroneous.

The remaining arguments require no further discussion. The rulings that two of the claims were barred by limitations need not be treated in view of the conclusions we have reached on the record before us. We conclude that there was no reversible error, and the judgment is

AFFIRMED.

compared to pilots working there, he was not senior to those pilots with respect to length of service in the company. Mr. Kentroti admitted having been told that the hiring of professional instructors was an experiment and if it did not succeed, he might have to be replaced by a line pilot. The plaintiff said that he was not interested in "flying the line" on a regular scheduled basis, but was interested in flying the line to gain insight into the problems which existed to make himself a better instructor. (I R. 108–09).

With respect to his claim of retaliatory discharge, the plaintiff testified that he believed he had told Mr. Jack Robins (author of the termination letter), before his termination that he had filed the complaint with the Department of Labor. He also said Mr. Burson had told him during their discussions that if he persisted he was going to get fired.