Alphonse H. **CARTER**, Plaintiff,

v.

**WESTINGHOUSE ELECTRIC CORPORATION**, Defendant.

**Civ. A. No. 87–1617.**

United States District Court, W.D. Pennsylvania.

Dec. 5, 1988.

Edward A. Olds, Pittsburgh, Pa., for plaintiff.

Alfred W. Vadnais, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendant.

## MEMORANDUM AND ORDER

SMITH, District Judge.[1]

This matter comes before the Court on a Motion for Summary Judgment filed by Defendant, Westinghouse Electric Corporation. Plaintiff, Alphonse H. Carter, a 60–year old black male, alleges that he was improperly excluded from certain work assignments and otherwise discriminated against by defendant because of his race, and was discharged during a reduction in force in 1985 because of his race and his age. Westinghouse denies that it discriminated in any way against Dr. Carter because of his race or his age, additionally asserts that any cause of action based on the alleged racial discrimination is barred by the statute of limitations and states that the reduction in force carried out in August 1985 was undertaken for legitimate business reasons. Westhinghouse alleges that Dr. Carter was released from his post at the Corporate Quality Group ("CQG") of the Westinghouse Productivity and Quality Center ("PQC") pursuant to articulable, nondiscriminatory standards. Dr. Carter proffers evidence that he argues would show that the standards enunciated are pretextual. For the reasons stated below, we grant defendant's motion.

1. This matter was reassigned to this judge by

## I. Applicable Law

Plaintiff's race-discrimination cause of action arises under 42 U.S.C. § 1981, which provides to "[a]ll persons ... the same right ... to the full and equal benefit of all laws." His age discrimination cause of action arises under 29 U.S.C. § 623(a), which makes it unlawful to discharge an individual or otherwise adversely affect his status as an employee because of his age.

The applicable standards for proof of age discrimination are well defined. *See Healy v. New York Life Insurance Company*, 860 F.2d 1209 (3rd Cir.1988); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3rd Cir.) (en banc) cert. dismissed —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). A plaintiff must show (1) membership in the protected class, 29 U.S.C. § 631; (2) that he was qualified for the position from which he was discharged; (3) that he was discharged despite his qualifications. Finally, in a force-reduction case, plaintiff must show (4) that a younger person was retained in the plaintiff's position. *Duffy v. Wheeling Pittsburgh Steel Corp*, 738 F.2d 1393, 1395 n. 2. (3d Cir.) *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984) cited in *Healy v. New York Life Insurance Co.*, supra, 860 F.2d at 1214 n. 1. The person retained must be sufficiently younger than the plaintiff to permit an inference of age discrimination. *Id.*

Once the *prima facie* case is established, the burden shifts to the employer to show legitimate non-discriminatory business reasons for the employee's discharge. If the employer does so, the burden shifts back to the employee to show, in the context of a motion for summary judgment, a genuine issue of material fact that the business reasons proffered are pretextual. As experience teaches, the conflict in requests for summary judgment most often lies in the claim that the legitimate business reasons articulated are a facade to conceal discriminatory decisions. *Id.*

The paradigm and the allocation of the burdens of proof are the same in the Section 1981 action alleging race-based disparate treatment. *Kentroti v. Frontier Air-*

Order of November 8, 1988, per Cohill, C.J.

*lines, Inc.,* 585 F.2d 967, 969 (10th Cir. 1978).

The statute of limitations for the plaintiff's Section 1981 claim is given by the substantive law of the place of employment, in this case 42 Pa.C.S. § 5524, which sets a limit of two years. *See Goodman v. Lukens Steel Company,* 482 U.S. 656, —— ——, 107 S.Ct. 2617, 2620–21, 96 L.Ed.2d 572, 581–82 (1987).

Our jurisprudence must be based on an appreciation of the purpose of the Age Discrimination in Employment Act ("ADEA") under which this action arises. While the ADEA reflects a mandate to eradicate both express and tacit discrimination against employees because of age, it does not create a preference for workers in the protected class, nor is it intended to affect the operations of businesses in changing competitive environments by skewing business costs toward any social goal other than the one intended by the Congress: fairness. *See E.E.O.C. v. United States Steel,* 649 F.Supp. 964, 966 n. 1 (W.D.Pa.1986).

## II. Facts

Dr. Carter graduated from high school in 1947. After several laborer jobs in industry and service in the United States Army, he attended college, receiving a B.S. in Finance from Duquesne University in 1961. In 1962 Dr. Carter joined the Kroger Company as a management trainee. Over the next ten years, he moved up within Kroger, holding personnel management positions of increasing responsibility. In the fall of 1972, Dr. Carter took a leave of absence to pursue a Ph.D. in Organization Behavior at the University of Cincinnati. By 1976 he had completed all of the non-dissertation requirements. During this time Dr. Carter and his wife also formed a personnel consulting company. In 1976 he was recruited by Walter Dollard, general manager of Westinghouse's Nuclear Fuel Division, to be the Director of Human Resources. In 1981, the year he received his Ph.D., Dr.

Carter moved to the PQC as a Manager of Quality Training. His immediate supervisor, Jack LaPointe, was Manager of Training and Development and supervised two other Managers of Quality Training, Edward Godwin and Joseph Lojek. (Barra Deposition, 46). On the same level as LaPointe, and reporting with LaPointe to the head of the CQG, Ralph Barra, were two Managers of Quality Resources, Don Pankey and Nate Moore, and three Managers of Quality Projects, Michael Aquino, Casimir Welch, and Art Green. (Carter Deposition, 60; Moore Deposition, 21–22; Kelley Affidavit, Paragraph 2).

The CQG was responsible for training, review, and assistance to the corporate divisions of Westinghouse in improving the quality of products and the efficiency of production methods. Carter, whose background was in organization behavior and personnel administration (Carter deposition, 16–24), designed training[2] programs for management personnel, managed quality circle training, and conducted "quality fitness reviews", or "quality audits", which were inspections of technical production problems and organizational inefficiencies.

Dr. Carter's role was primarily in the training programs (Carter deposition, 114, 122); the Quality Resource managers, Pankey and Moore, led the quality audits, for which their engineering backgrounds qualified them (See Carter deposition, 60–61, Kelley Affidavit, Exh. 1, Pankey deposition, 13, 49); the Quality Project Managers, Green, Welch, and Aquino, who assisted Carter and the other Training Managers, were hired because of their special expertise. (Barra Deposition 40, 65–66; Moore Deposition 22–23; Pankey Deposition 41–42; Green Deposition 10–11; Aquino Deposition 15). Art Green had a background in costs and accounting, as well as engineering experience; a B.S. in Electric Engineering, a B.A. in Math and an M.B.A.; and approximately twenty years of service with Westinghouse, of which ten were spent as a manager of various financial-related posi-

---

**2.** Quality circles, a production quality control technique widely introduced in the 1970's, elicit feedback from production personnel both to

eliminate obstacles to efficient production and to raise the level of employee commitment to corporate success.

tions, when he was hired by Barra in 1981. (Green Deposition, 5–6; Barra Deposition, 39–40; Kelley Affidavit, Paragraph 2, Exh. 1). He was brought in to work in quality cost training and quality measurement, and to bring controllers and financial people more into the quality arena. (Barra Deposition, 39–40; Green Deposition, 10).

Aquino had a background in purchasing and manufacturing, as well as experience in quality control. He had a B.S. in Industrial Management and had been employed by Westinghouse for approximately seventeen years when hired by Barra. (Aquino Deposition, 6–8, 15; Kelley Affidavit Exh. 1).

Casimir Welch was brought in because of his marketing and international strength. (Barra Deposition 43–44). He had a B.S. in Electrical Engineering and had been employed by Westinghouse for over twenty-two years prior to being hired by Barra, most of which was spent in marketing and international assignments. (Welch Deposition 6–8; Kelley Affidavit, Paragraph 2, Exh. 1).

In the mid–1980's, Westinghouse began to reorganize itself worldwide from a centralized organization to one in which the separate corporate divisions were expected to act with more autonomy. (Fooks deposition, 34–35). This resulted in 1985, in a de-emphasis on the PQC, the budget for which was to be reduced by six to seven million dollars. (*Id.*, 35–37). The director of the PQC, John Fooks, took steps to cut the budget by the target amount by terminating outside projects, closing an office in Japan, and ending support for a specialized laser system. A second option, to sell PQC services outside the company, was decided against. (*Id.*, 43–46) (. . . "[W]e are not [chartered] to sell Westinghouse [know-how] outside."). Despite these reductions, and an increase in the cost charged by the PQC to the business units, the budget reduction still required a reduction in force. Fooks obtained an estimate from his controller, David Clendennen, of the personnel cuts required across the PQC, and met with the heads of the business groups, including Ralph Barra of the PQC, to inform them of their new mandated strength level and discuss how to implement the reductions. (Barra deposition, 111–14; Fooks deposition, 60–61). The criteria discussed with the group heads stressed the ability to sell the PQC's products—advice and training—to the business units on an entreprenurial basis.

Barra was ordered to cut his staff from eight to five managers, and although he was given discretion over the selection of the three who would be discharged, he was given no leeway in the number to be cut, despite his belief that he could generate profit from the CQG with eight. (Barra deposition, 111–14).

Barra concluded, based on the twin goals of diversity of qualifications and ability to sell skills to the various business units, that managers with technical, engineering, and production education and experience would be preferable to managers with personnel management backgrounds, given the need to work with the business units and given Westinghouse's de-emphasis of quality-circle training. (Barra deposition, 149). He also concluded that managers with proven sales records would be more valuable than ones with low billable hours. His assessment of the skills and records of the personnel in the CQG led him to recommend the retention of the Quality Resource Managers, Pankey and Moore. Art Green was similarly retained by Barra because of his ability in the quality costs area, an area being emphasized in the PQC (Barra deposition 141–42). After selecting Ed Godwin as the next strongest member of his staff, Barra had the plaintiff, Mike Aquino, Casimir Welch, and Joseph Lojek from which to choose one to remain. As Barra expressed it, the final choice came down to Mike Aquino, who had both technical skills and management experience, over Casimir Welch, who was strong in marketing. Lojek and plaintiff, due to their lower potential for marketing, and their lack of technical and managerial experience, were likewise advised of Barra's decision to terminate their positions as of the end of 1985. (See Barra deposition, Exhibits 3, 4, 5).

After plaintiff's November 30, 1985, separation from Westinghouse, he filed an administrative complaint alleging age discrimination in his termination, on May 21, 1986, with the EEOC. Upon the EEOC's failure to act within the statutory time period, Dr. Carter filed the complaint giving rise to this action on August 3, 1987.

### III. Analysis

*Section 1981*

■ Because all of the acts identified by plaintiff as racially discriminatory took place prior to two years before the Complaint was filed, plaintiff's claims of racial discrimination in the selection of job assignments allotted to him are barred by the statute of limitations. *Goodman v. Lukens Steel Company*, 482 U.S. 656, ——, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572, 582 (1987); see also *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (Title VII claim time barred). Plaintiff was informed that he was terminated effective November 30, 1985, by Ralph Barra on August 5, 1985. The acts that he defines as racially discriminatory—selecting him last for assignments, depriving him of a teaching trip to Norway, and a social snub by a co-worker on a business trip to Puerto Rico—all took place well before that, in 1982 through 1984. (Carter deposition, 134–36; 143–44; 151–53; 168–69). We note in passing that Dr. Carter did not, despite his management experience in dealing with race discrimination in employment, call these incidents to the attention of the EEOC. The administrative complaint filed in 1986 complained only of age discrimination.

■ If we were to reach the merits of the Section 1981 cause of action, we would still be compelled to grant summary judgment in favor of defendant on the record here before us. It is doubtful that plaintiff has proved even a prima facie showing of intentional discrimination in work assignments for which he was qualified based on his race. *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 382–91, 102 S.Ct. 3141, 3145–50, 73 L.Ed.2d 835 (1982). The disparity in assigning training courses appears from plaintiff's own assessment to have been based on the technical demands of the training program which plaintiff was not qualified to meet. (Carter deposition, 184–85). The social snub suffered by plaintiff on the Puerto Rican business trip, if it is not simply speculation on Dr. Carter's part that race was involved (Carter deposition, 168–70), certainly could have had nothing to do with the terms of his employment, his assignments, or his eventual lay-off. The "Norwegian Incident"—Ralph Barra's assignment to himself, rather than to plaintiff, who had been asked initially by two Norwegian colleagues to arrange the training of a training trip to Norway—reflects a protectiveness towards turf by Mr. Barra who considered quality circle training to be his specialty. (Aquino deposition, 51; Lojek deposition, 35; Moore deposition, 30). It does not reveal even a scintilla of evidence that race was a consideration.

Assuming, arguendo, that plaintiff had proved a prima facie case of racial discrimination, there is ample evidence of record that the election of personnel for fitness reviews and training courses was done on the basis of non-discriminatory business reasons. The upper level training courses, as well as the quality fitness reviews, were led chiefly by the Resource Managers, Moore and Pankey, on the basis of their training and experience in production and quality assurance. The Resource Managers would assemble a team for the quality fitness reviews of outside specialists and would draw on the training managers as needed for assistance. Additionally, the project managers, who did not have the same training responsibilities as the training managers, were also used for these duties. (Carter deposition, 150; Moore deposition, 24–31; Pankey deposition, 21, 25–30, 36, 41; Green deposition 10–11; Lojek deposition, 15–16, 19–20; Aquino deposition, 14–15; Godwin deposition, 32–33).

Plaintiff has alleged that the proffered technical qualification preference identified by Westinghouse, and acknowledged by him in 1984 as a factor in assessing his performance (Carter deposition, Exhibit 5)

is pretextual. While a technical degree was not essential to participate in the fitness reviews and upper level training courses, it was an asset in dealing with the business units on a practical level. (Moore deposition, 66; Pankey deposition, 39, 48–49). Plaintiff and his co-worker (Welch) without technical experience had problems in fitness reviews because of this lack of scientific or engineering experience (Pankey deposition, 49, 51; Moore deposition, 60). We find not a shred of evidence in Dr. Carter's Response to Summary Judgment Motion to indicate that Westinghouse used the need for technical expertise as an excuse to shut plaintiff out of assignments. (And cf. Carter deposition, 51, with Godwin deposition, 74). Rather, Plaintiff's Response asserts, without factual support, that the job assignments were steered away from him because Carter's peers declined to work with him because of his race, and that his supervisors viewed him as a problem because of his race. Such bald assertions do not create a material issue of fact necessary to defeat a motion for summary judgment.

*Age Discrimination*

■ To counter the non-discriminatory selection criteria identified by defendant for its reduction in force in the CQG, plaintiff offers the fact that the three oldest members of the CQG—Carter, Welch, and Lojek—were the ones discharged, as well as statistical evidence which would tend *to* show the statistical improbability of the discharge of managers in the PQC absent consideration of age. (Plaintiff's Response to Summary Judgment Motion, Exh. B). While statistical and indirect evidence such as this can meet the plaintiff's burden of proving a prima facie case, it does not create a material issue of fact challenging the reasons given for the lay-offs in the CQG.

First, although plaintiff suggests that there is evidence showing a directive from some unknown, unnamed Westinghouse source to discharge older workers, (plaintiff's response, Paragraph 19) we are not directed to any citation to the record nor does our review of the record disclose such

evidence, which would be inadmissible in any event. See F.R.E. 602.

The use by plaintiff's expert of PQC-wide statistical evidence to argue that Westinghouse used age as a criterion in Ralph Barra's discharge of Dr. Carter is not probative of any pretext. No challenge has been made, other than the bare allegation discussed above, to the evidence that Ralph Barra alone made the decision within the CQG to reduce his staff. This renders the events taking place in the other divisions irrelevant. *Healy v. New York Life Insurance,* supra, 860 F.2d at 1218. While statistical evidence, like other circumstantial evidence, can be competent and probative of material facts, it must first be relevant.

Additionally, statistical correlation standing alone does not permit an inference of causation. Some hypothesis which contains a causal connection between the trait observed (in this case, age) and the effect produced (in this case, discharge) is necessary. Otherwise, any absurd sorites can be proved by statistics. For instance: the sun comes up each morning, I drink coffee each morning, therefore, sunrise causes me to drink coffee. Or: I drink coffee each morning, the sun comes up each morning, therefore, sunrise is due to my drinking coffee. In each example, the statistical correlation is at least as strong as that proffered by plaintiff. Yet the conclusions are patently erroneous, because it is obvious that no mechanism exists through which the drinking of coffee is either the cause or effect of sunrise. On the other hand, the air temperature in Pittsburgh rises, on most days, in the hours after sunrise. Although the correlation is lower than in my coffee drinking example, the conclusion that the sunrise causes the temperature rise is accepted because the mechanism through which the radiant energy of the sun causes warming of the air is understood.

Applying this to the instant proceedings, even though the statistical correlation offered by plaintiff must be accepted as true for purposes of the Motion, no suggestion, much less a persuasive one, has been made

that the age of an employee was a causal factor in his discharge from the CQG.

To make clear what is lacking in plaintiff's argument, we examine in turn some possible reasons that defendant could have been discriminated against because of his age. First, there may be a tacit desire to eliminate older employees, with longer years of service to reduce the wages, salaries, or pension benefits to be paid. *See White v. Westinghouse Electric Company,* 862 F.2d 56 (3d Cir.1988). This causal link does not apply here; the workers discharged from the CQG, including plaintiff, were neither the highest paid nor had the longest years of service.[3] This particularly is the case with plaintiff, with by far the fewest years of service (a factor, incidentally, identified by Ralph Barra as making plaintiff less desireable due to his lesser experience) in the CQG. It is also reasonable to suggest that age discrimination would result from a stereotyping of older workers as less productive, see 29 U.S.C. § 621(a)(1), and therefore more expendable in business operations. Yet individualized assessment of productivity was undertaken by Barra as a specific, although not dispositive, factor, most notably in the evaluations of Welch and of plaintiff. Further, the discharge evaluations were consistent with the plaintiff's evaluations from prior years. *Cf. Healy, supra,* 860 F.2d at 1215.

A plaintiff-nonmovant facing summary judgment in an age discrimination suit wherein defendant has demonstrated that the plaintiff's discharge was due to articulated, nondiscriminatory standards must produce counter-affidavits, or other evidence to demonstrate that there is a reason to disbelieve the explanation given for discharge, or there is no disputed issue of material fact. *Healy, supra,* 860 F.2d at 1215. Simply asserting that the reasons are pretext does not bear the burden of either showing that a discriminatory reason more likely motivated the employer, or that the explanation given is unworthy of belief. *See Chipollini, supra,* 814 F.2d at 900.

As we have stated, plaintiff has not shown that the nondiscriminatory reasons given are not credible. To the extent that plaintiff suggests that Barra's testimony in this regard is not credible, because of hidden personal animus (Plaintiff's Response, Paragraph 14), plaintiff ignores two facts. One is Barra's suggested retention of either Carter or Welch upon his retirement, which followed the August 1985 layoffs by only weeks. (*Id.,* Paragraph 2; Barra deposition, 5, 12).

Secondly, the reason advanced by plaintiff for Barra's lack of credibility, i.e., his professional jealousy, would require us to believe Barra's motives in recommending plaintiff's discharge were not the non-discriminatory ones demonstrated by defendant, but rather ones which are less praiseworthy, but similarly beyond the scope of the ADEA. *See Chipollini, supra,* 814 F.2d at 903 (Hunter, J., dissenting); *White v. Vathally,* 732 F.2d 1037, 1042–43 (1st Cir.1984). Whether we accept Barra's testimony as entirely truthful or whether we accept plaintiff's position that Barra was jealous, there is no evidence whatsoever for plaintiff's contention that age was a factor in his employment or in his discharge.

An appropriate order will be entered.

---

**3.** And see Kelley Affidavit of August 17, 1988, Paragraph 16.